PEOPLE v HEFLIN

PEOPLE v LANDRUM

Docket Nos. 79423, 83994. Argued June 8, 1989 (Calendar Nos. 10-11). Decided April 30, 1990. Rehearings denied 435 Mich 1204.

L. D. Heflin was convicted by a jury in the Van Buren Circuit Court, Meyer Warshawsky, J., of second-degree murder and possession of a firearm during the commission of a felony. The Court of Appeals, MAHER, P.J., and T. M. BURNS and BELL, JJ., in an unpublished opinion per curiam, reversed and remanded for a new trial, holding that it was prejudicial error to refuse to instruct the jury regarding the lesser included offense of statutory involuntary manslaughter (Docket No. 85513). The people appeal.

Celestine Landrum was convicted by a jury in the Jackson Circuit Court, Charles J. Falahee, J., of second-degree murder. The Court of Appeals, R. B. BURNS and R. L. TAHVONEN, JJ. (SHEPHERD, P.J., concurring), in an opinion per curiam, reversed and remanded the case for reconsideration in light of *People v Beach,* 429 Mich 450 (1988) (Docket No. 79079). On remand, the Court, SHEPHERD, P.J., and CYNAR and MacKENZIE, JJ., in an opinion per curiam, affirmed, holding that the failure to instruct with regard to common-law involuntary manslaughter failed to allow the jury to convict the defendant of an offense consistent with the theory of her case (Docket No. 107761). The people appeal.

In *Heflin,* in an opinion by Chief Justice RILEY, joined by Justices BRICKLEY, BOYLE, and GRIFFIN, the Supreme Court *held:*

The trial court did not err in refusing to instruct the jury regarding the offense of statutory involuntary manslaughter, even though it instructed the jury regarding voluntary manslaughter. The decision of the Court of Appeals is reversed, and the decision of the trial court is reinstated.

1. In a criminal case, if an instruction regarding a lesser

REFERENCES
Am Jur 2d, Homicide §§ 42, 43, 70; Trial § 878.
See the Index to Annotations under Homicide; Instructions to Jury.

included offense is requested, but no evidence in support of a conviction of the lesser included offense is offered, or the facts would oblige the court or the jury to conclude that the defendant was guilty or not guilty of the offense charged, no instruction with regard to the lesser included offense need be given.

2. Lesser included offenses are categorized as necessarily included and cognate lesser offenses. Necessarily included lesser offenses are those in which the greater offense cannot be committed without also committing the lesser offense. Cognate lesser included offenses are those in which the lesser offense shares some common elements with the greater offense, but also may include some elements not found in the greater offense. Where the lesser offense is necessarily included, the evidence will always support the lesser offense if it supports the greater; however, where the lesser offense is cognate, the specific evidence must be examined to determine whether it would support a conviction of the lesser offense. A defendant may request and receive necessarily included offense instructions without regard to the evidence, but may receive a cognate lesser included offense instruction only if the evidence adduced at trial would support a conviction of the lesser offense.

3. Statutory involuntary manslaughter is a cognate lesser included offense of murder. Thus, the trial court did not err in refusing to instruct the jury regarding the offense of statutory involuntary manslaughter even though it instructed the jury regarding voluntary manslaughter. The defendant could have required the prosecutor to prove that the defendant had the requisite mens rea for murder, but chose to concede an element in order to proceed with his sole ground for defense. He cannot now seek reversal on the basis of the trial court's refusal to instruct regarding an offense inconsistent with the evidence and the defendant's theory of the case. A trial court need not instruct the jury regarding inconsistent theories when neither party produces a modicum of evidence in support of a particular theory.

In *Landrum,* in an opinion by Chief Justice RILEY, joined by Justice GRIFFIN, with Justices BRICKLEY and BOYLE concurring in the result only, the Supreme Court *held:*

The decision of the Court of Appeals is reversed, and the decision of the trial court is reinstated.

Chief Justice RILEY, joined by Justice GRIFFIN, stated that a person may use deadly force in self-defense to repel a criminal sexual assault where confronted with force that the person reasonably believes could result in imminent death or serious bodily harm. Thus, a trial court should so instruct the jury.

However, the trial court did not err in failing to instruct the jury, sua sponte, regarding common-law involuntary manslaughter. The trial court's instructions did not result in manifest injustice. Rather, the instructions adequately presented the defendant's theory of self-defense, and the defendant offered no evidence which would support a conviction of common-law involuntary manslaughter, i.e., a lawful act negligently performed.

Justice BRICKLEY stated that to the extent that the defendant would be entitled to an instruction, sua sponte, regarding involuntary manslaughter, the fact that the jury passed over a voluntary manslaughter instruction and found the defendant guilty of second-degree murder indicates that it had no misgivings about the defendant's malice. Although the defense of excessive force in the execution of self-defense would have been more in keeping with involuntary, rather than voluntary, manslaughter, a verdict of voluntary manslaughter would not necessarily have been inconsistent with the evidence presented. Thus, there was no manifest injustice in the failure to give this instruction or in any deficiency in the self-defense instruction given to which the defendant raised no objection.

Justice BOYLE stated that because the defendant failed to request or to object to the omission of an involuntary manslaughter instruction, she is precluded from claiming error in the omission.

*Heflin,* reversed.

*Landrum,* reversed.

Justice ARCHER, concurring in part and dissenting in part, stated that while in *Heflin* the trial court did not err in refusing to instruct the jury regarding statutory involuntary manslaughter because there was no evidence that the defendant accidentally or unintentionally killed the victim, in *Landrum,* the trial court's instructions did not adequately present the defendant's theory of the case to the jury. The defendant was entitled to have the jury instructed with regard to involuntary manslaughter. The jury also should have been instructed that the defendant had the right to use the force required to repel the attempted rape, including deadly force. Failure to give the appropriate instructions resulted in prejudice to the defendant, and, consequently, the error cannot be deemed harmless.

Justice LEVIN, joined by Justice CAVANAGH, dissenting in *Heflin,* stated that the trial court erred in refusing to give a requested instruction on statutory involuntary manslaughter.

The fact of homicide gives rise to a permissible inference, not

a mandatory presumption, of malice without regard to whether the homicide was committed with a deadly weapon. In this case, there was no direct evidence that the defendant acted with the intention to kill, and malice could only be found by drawing inferences from the circumstances of the killing. Because "accident" is not a separate element of statutory involuntary manslaughter, the defendant was entitled to the requested instruction, because the jury could have inferred from the evidence that he acted without malice. To hold otherwise, is to adopt in effect the presumption that a person who commits a homicide acted with malice, a presumption that stands in direct conflict with precedent. It may be, or may seem to be, natural to infer that a defendant acted with malice when the record does not contain any affirmative evidence of "accident"; however, it is not proper for a trial or a reviewing court to draw that inference. Even when the prosecution's evidence is uncontroverted, the defendant's state of mind is always a question of fact for the jury.

A request to instruct on common-law involuntary manslaughter could not properly be denied because the defendant asserted self-defense or because the killing may have occurred during the commission of an unlawful act. The evidence in the instant case justified a conviction of common-law involuntary manslaughter. The question whether the defendant acted with the mens rea necessary for murder or for involuntary manslaughter was for the jury.

If a defendant who is charged with murder, asserts self-defense, the trial court, consistent with the defendant's right to a general verdict, could not limit the jury's choice to guilty of murder, or not guilty by reason of self-defense. In this case, to hold that the assertion of self-defense is inconsistent with statutory involuntary manslaughter reflects an assessment by the majority that the evidence shows that the defendant intended to kill the victim, an assessment which invades the province of the jury. The question is not whether the evidence was sufficient to support the jury's finding that the defendant acted with malice, but whether the evidence would have justified a finding that he acted without malice and therefore was guilty of involuntary manslaughter.

Because the jury rejected the defendant's claim of self-defense, there is no reason to believe that the defendant would have been acquitted altogether had the trial court instructed the jury on statutory involuntary manslaughter. The case should be remanded to the trial court for entry of a judgment of conviction of statutory involuntary manslaughter, with the

option of retrial on a charge of second-degree murder, and for resentencing.

Justice LEVIN, joined by Justice CAVANAGH, dissenting in *Landrum,* stated that a woman is entitled to use force, including deadly force *if necessary,* to prevent any nonconsensual intercourse.

Instead of focusing on whether an assailant presents a threat of imminent death or serious bodily harm in furtherance of a sexual assault, the focus should be on whether the woman consented to the sexual activity with which she was confronted. Nonconsensual intercourse, whether or not it is accompanied by a belief that one is in danger of imminent death or other serious bodily harm, is an attack on a woman's autonomy and bodily integrity.

A court does not adequately inform a jury that a woman is entitled to use deadly force to prevent a threatened sexual assault when it instructs the jury without further elaboration that a woman is entitled to use deadly force to prevent serious bodily harm. The common-law formulation is inadequate, not because sexual assault is not a serious harm, but because in some situations a significant portion of the harm caused by a sexual assault might not be characterized by the jury as bodily harm. Bodily harm commonly refers to physical, not psychological or emotional, injury; however, in many cases, the violation of a woman's bodily autonomy and the accompanying psychological and emotional trauma may be the most harmful and long-lasting injury. It cannot be assumed that a jury, without further instruction will conclude that rape is a form of serious bodily harm, especially where the woman, like the defendant, is a prostitute.

The court which instructed, sua sponte, on voluntary manslaughter erred in failing to give an instruction, sua sponte, on involuntary manslaughter. There was evidence from which the jury could have found that the killing was unintentional, or that the defendant administered blows to the decedent in a lawful attempt to protect herself from imminent death or serious bodily harm, or that in performing the lawful act of defending herself against imminent death or serious bodily harm, she used more force than was necessary and acted in a grossly negligent manner.

Inquiring whether the defendant's acts were lawful or unlawful is flawed analysis. The distinction between a lawful act and an unlawful act as the analytical predicate for defining the elements of involuntary manslaughter is no longer tenable. In *People v Aaron,* 409 Mich 672 (1980), the Court abolished the

common-law rule that the mens rea for murder was supplied by the intention to commit the underlying felony, necessarily implying that a killing which occurred during the commission of a felony, consistent with the evidence, could be involuntary manslaughter or an innocent homicide. Where a request to instruct on involuntary manslaughter as a lesser included offense of murder is denied because the killing occurred during the commission of a felony, the presumption that was abolished in *Aaron* is allowed to resurface. A request to instruct on involuntary manslaughter should not be denied—consistent with *Aaron*—solely on the basis that in the judgment of the court the killing occurred during the commission of an unlawful act that has a natural tendency to cause death or great bodily harm. In determining whether the evidence would justify a conviction of involuntary manslaughter, the relevant inquiry is whether the defendant's conduct was grossly negligent with respect to the safety of other persons.

171 Mich App 148; 429 NW2d 818 (1988) reversed.

1. CRIMINAL LAW — JURY INSTRUCTIONS — LESSER INCLUDED OFFENSES.

In a criminal case, if an instruction regarding a lesser included offense is requested, but no evidence in support of a conviction of the lesser included offense is offered, or the facts would oblige the court or the jury to conclude that the defendant was guilty or not guilty of the offense charged, no instruction with regard to the lesser included offense need be given.

2. HOMICIDE — STATUTORY INVOLUNTARY MANSLAUGHTER — LESSER INCLUDED OFFENSES.

Statutory involuntary manslaughter is a cognate lesser included offense of murder (MCL 750.329; MSA 28.561).

3. CRIMINAL LAW — JURY INSTRUCTIONS — INCONSISTENT THEORIES.

In a criminal case, the trial court need not instruct the jury regarding inconsistent theories where neither party produces a modicum of evidence in support of a particular theory.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Juris Kaps,* Prosecuting Attorney, and *J. Michael James,* Assistant Prosecuting Attorney, for the people in *Heflin.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Joseph S. Filip,* Prose-

cuting Attorney, and *Jerrold Schrotenboer,* Chief Appellate Attorney, for the people in *Landrum.*

State Appellate Defender (by *F. Michael Schuck*) for the defendants.

Amicus Curiae:

*Mogill, Posner & Cohen* (by *Marjory B. Cohen*) for Women Lawyers Association of Michigan.

RILEY, C.J. In these cases, consolidated for purposes of appeal, we are asked to determine whether the trial courts erred in refusing to give jury instructions on common-law and statutory involuntary manslaughter[1] and self-defense. If we conclude that the trial courts erred, then we must also decide whether the errors were harmless.

In *People v Heflin,* we hold that the trial court did not err in refusing to instruct the jury regarding the offense of statutory involuntary manslaughter even though it instructed the jury regarding voluntary manslaughter. We reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

In *People v Landrum,* we would hold that the trial court did not err in failing to give, sua sponte, an instruction regarding common-law involuntary manslaughter. We also would hold that the trial court's instruction to the jury adequately presented defendant's theory of self-defense. Therefore, we reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

### I. FACTS AND PROCEEDINGS

#### A. PEOPLE v HEFLIN

On August 3, 1984, defendant shot and killed his

---

[1] MCL 750.329; MSA 28.561.

son-in-law, Rory "Rich" Petersen. The prosecutor charged defendant with first-degree murder, MCL 750.316; MSA 28.548, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). A jury convicted defendant of second-degree murder, MCL 750.317; MSA 28.549, and felony-firearm. Defendant received a prison term of nineteen to forty years for the second-degree murder conviction and the mandatory two-year prison term for the felony-firearm conviction.

At approximately 3:30 P.M. on the afternoon of the fatal shooting, Wilma Heflin, defendant's wife, and Marcia Petersen, defendant's daughter and the deceased's wife, were canning food at the defendant's home. Rich Petersen, who had earlier dropped his wife and children off at defendant's home, drove into defendant's driveway to pick up Marcia and their two children, Tara and Joshua Richard. He never left his car. Marcia came outside and asked Rich to return in about an hour. Rich left immediately.

Defendant confronted Marcia about the incident and became enraged after Marcia confirmed his suspicion that Rich had just driven up his driveway. Apparently, defendant had warned Rich not to come onto defendant's property. Defendant and his wife asserted that the animosity they felt toward Rich was premised partially on their belief that Rich physically abused Tara and Joshua.[2]

At the time of the confrontation between defendant and Marcia, defendant had noticed several

_____

[2] Defendant admitted that he considered Rich "a no-good bastard." Defendant's wife referred to Rich as a "leach and a sponge." Defendant's son, Joey Heflin, stated that defendant had previously threatened to "stop his (Rich Petersen's) ass," and his wife testified that some months earlier, defendant "probably would have beat him to death." On the other hand, defendant's wife also stated that Rich had threatened them on numerous occasions.

bruises on Tara's face and threatened to beat
Marcia if he ever saw the child's face bruised
again. Marcia claims that defendant slapped her
at that moment, causing her to lose her balance
and fall; whereas, defendant claims that he acci-
dentally knocked Marcia down when he reached
over to pick up Tara. In either case, Marcia
grabbed the children and ran home. Rich became
angry after Marcia entered their home crying that
defendant had hit her. Rich got into his car and
drove toward defendant's house.

Defendant testified that he noticed Rich driving
down his street at approximately forty to forty-five
miles per hour, honking his horn. Defendant went
into the house, retrieved a loaded[3] 12-gauge shot-
gun from behind the front door, and reappeared in
the front yard. Rich stopped the car in the street
and yelled, "yeah . . . I beat her. What are you
going to do about it?" at which point defendant
testified he saw Rich reach over toward the pas-
senger side of the car for what defendant thought
was a gun.[4] Defendant shot and killed Rich. The
evidence established that he fired all five rounds
from the shotgun. However, defendant only re-
members shooting the gun one time. Rich was shot
twice, and died almost instantaneously.

At trial, defendant admitted shooting Rich, but
argued that he acted in self-defense and for the
safety of his daughter and granddaughter. He also
stated that he felt fearful and angry when he saw
Rich approaching his house. In addition, defen-
dant's wife testified that Rich had threatened the
Heflins on several prior occasions.

---

[3] Some evidence suggested otherwise. The police found an empty
box of 12-gauge shotgun shells on the bed in the guest bedroom. At
the very least, this raised the inference at trial that defendant went
into the house, retrieved and loaded the shotgun, and then returned
outside to confront Petersen.

[4] The police never found a gun in the car. In fact, Marcia testified
that defendant knew Petersen did not own a gun.

The trial judge instructed the jury regarding the charges of first- and second-degree murder, self-defense, and voluntary manslaughter, but he refused defendant's request to instruct the jury for the offenses of statutory involuntary manslaughter, involuntary manslaughter, reckless use of a firearm, and arguably imperfect self-defense.[5] During deliberation, the jury requested that the judge reinstruct them with regard to first- and second-degree murder and manslaughter. The judge complied. The jury convicted defendant of second-degree murder and felony-firearm.

Defendant appealed, and the Court of Appeals reversed in an unpublished per curium opinion and remanded the case for a new trial. The Court of Appeals held that the trial court committed prejudicial error in refusing to instruct the jury regarding the lesser included offense of statutory involuntary manslaughter. This Court granted leave to appeal in consolidation with *People v Landrum,* limited to the issue whether the trial judge must instruct the jury regarding the offense of statutory involuntary manslaughter when it also instructs the jury regarding voluntary manslaughter.[6]

### B. PEOPLE v LANDRUM

A jury convicted defendant of second-degree murder, MCL 750.317; MSA 28.549, for the beating death of sixty-seven-year-old Henry Thomas on December 5, 1983. Defendant, an admitted prosti-

---

[5] Defendant did not expressly raise the imperfect self-defense argument. The Court of Appeals disposed of the issue on this basis. This Court denied defendant's application for leave to appeal, which included the issue of "imperfect self-defense." 430 Mich 890 (1988). Although defendant requested that we address this issue in his brief and at oral arguments, we decline to do so.

[6] 430 Mich 890 (1988).

tute, stated that she met Thomas at a local bar a
week earlier and that he solicited her services
then, but had no money. Defendant told Thomas to
return when he had money. On December 5,
Thomas returned to the bar and requested that
the defendant accompany him to his residence.
Defendant agreed after Thomas promised to pay
her thirty dollars when they got to Thomas' house.
On the way to defendant's home, they stopped off
at a local liquor store to pick up some whiskey.

Defendant and Thomas drank the whiskey and
danced for about an hour after they first arrived
at Thomas' house.[7] Shortly thereafter, Thomas told
defendant to take off her blouse. Defendant agreed
to do so, but only after Thomas paid her the thirty
dollars that they previously agreed upon. Thomas
never responded. The two resumed dancing. Defen-
dant stayed because she assumed that Thomas
would eventually pay her the thirty dollars. After
approximately an hour, Thomas said that he had
the money and asked defendant to go into the
bedroom. Defendant complied. On the way to the
bedroom, Thomas pushed defendant toward the
bedroom and stated that he had decided not to pay
defendant, but that they would have sex anyway.
Once again, defendant said that Thomas had to
pay her before she would have sex with him. At
this point, Thomas told defendant that she could
either "fuck or fight." Defendant got undressed
and into the bed. Defendant stated that she was
not afraid Thomas would kill her. She continued
to protest that Thomas should pay her. Thomas
disrobed and began to climb on top of defendant
when she hit him on the head with the telephone

---

[7] Thomas had a blood-alcohol level of 0.16 percent. Defendant
admitted drinking whiskey with Thomas. She also stated that she had
consumed less than Thomas. However, the police never had an
opportunity to test her blood-alcohol level.

receiver. Thomas started bleeding profusely. Thomas grabbed defendant as she tried to get out of the bed, and the two fell to the floor. Defendant hit Thomas with the end table. She ran into the bathroom and closed the door.

Defendant stated that Thomas tried to force his way into the bathroom. Defendant moved away from the door, allowing it to swing open. Thomas' momentum carried him into the bathtub. Thomas pulled defendant into the bathtub and the two continued to fight. Defendant managed to get out of the bathtub. Thomas followed defendant and pushed her into the toilet, breaking the toilet seat. Defendant grabbed a bottle and beat Thomas with it several times. Next, defendant pushed Thomas back into the bathtub. Defendant grabbed the telephone receiver and continued to pummel Thomas every time he attempted to get out of the tub. Defendant stated that Thomas eventually gave up and appeared ready to fall asleep. As defendant got dressed, she heard defendant say, "[b]abe, are you still here?" Defendant replied, "[y]eah, I'm still here." Thomas repeated the question as defendant left the apartment.

Defendant went to a friend's house to clean Thomas' blood off herself and change her blood-stained clothes. She also testified that she attempted to call Thomas to make sure that he felt all right. Nobody answered. The police found Thomas dead in the bathroom and the bathroom virtually painted with his blood. Thomas had two broken ribs and a broken nose. Thomas had numerous cuts on his face and forehead, and several fractured teeth. He died due to an obstruction of his upper airway by blood and debris (his fractured teeth). Defendant, on the other hand, emerged from the fight relatively unscathed. The police arrested defendant the next day. She admit-

ted killing Thomas, but claimed she did not intend to do so and acted in self-defense.

The prosecutor charged defendant with first-degree murder. The trial judge instructed the jury with regard to second-degree murder,[8] self-defense, and, sua sponte, voluntary manslaughter. The trial court refused to instruct the jury with regard to common-law involuntary manslaughter ("gross negligence").

The jury found defendant guilty of second-degree murder. The Court of Appeals reversed defendant's conviction in a published per curiam opinion. *People v Landrum,* 160 Mich App 159; 407 NW2d 614 (1986). This Court remanded for reconsideration in light of *People v Beach,* 429 Mich 450; 418 NW2d 861 (1988). The Court of Appeals again reversed in another per curium opinion. *People v Landrum (On Remand),* 171 Mich App 148; 429 NW2d 818 (1988). The Court of Appeals concluded that the trial court's failure, sua sponte, to instruct with regard to common-law involuntary manslaughter failed to allow the jury to convict defendant of an offense consistent with the theory of her case. This Court granted leave to appeal in consolidation with *People v Heflin,*[9] limited to the following issues: (1) whether the trial court erred in not giving, sua sponte, an instruction regarding the offense of common-law involuntary manslaughter, (2) if so, whether the error was harmless, and (3) whether the trial court's instruction adequately presented the defendant's claim of self-defense to the jury.

---

[8] The trial court dismissed the charged offense of first-degree murder at the close of proofs.

[9] 431 Mich 906 (1988).

## II. PRIMARY LEGAL PRINCIPLES

### LESSER INCLUDED OFFENSE INSTRUCTIONS

This Court addressed the legal doctrines necessary to resolve issues involving lesser included offense instructions in *People v Beach, supra* at 460-465. In *Beach,* we reaffirmed the distinction between "necessary" and "cognate" lesser included offenses. Necessarily included lesser offenses are those in which the defendant cannot commit the greater offense without also committing the lesser offense. On the other hand, cognate lesser included offenses are those in which the lesser offense shares some common elements with the greater offense, but which may also include some elements not found in the greater offense. *Id.* at 461; *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975).

This distinction becomes important in determining when a trial judge must instruct the jury with regard to a particular lesser included offense. In *Beach,* this Court articulated the following rule:

> [W]hen the lesser offense is necessarily included, rather than cognate, the evidence will always support the lesser offense if it supports the greater. However, cognate offenses require the evidence in each particular trial to be examined to determine whether the specific evidence adduced would support a conviction of the requested lesser offense.
>
> . . . A Michigan defendant may request and receive necessarily included offense instructions without regard to the evidence, and a cognate lesser included offense instruction if the evidence adduced at trial would support a conviction of the requested lesser offense. [*Id.* at 463-465.]

It is against this backdrop that we must decide the cases before us today.

### III. ANALYSIS

#### A. *PEOPLE v HEFLIN*

Defendant primarily contends that the trial court erred when it refused defendant's requested instruction to the jury regarding the offense of statutory involuntary manslaughter when it also instructs the jury regarding voluntary manslaughter. MCL 750.329; MSA 28.561 defines statutory manslaughter as:

> Any person who shall wound, maim or injure any other person by the discharge of any firearm, pointed or aimed, intentionally but without malice, at any such person, shall, if death ensue from such wounding, maiming or injury, be deemed guilty of the crime of manslaughter.

Initially, defendant argues that statutory involuntary manslaughter is a cognate lesser included offense of murder. Although previously we have held that common-law involuntary manslaughter is a cognate lesser included offense of murder, we have not specifically addressed the issue whether statutory involuntary manslaughter similarly falls within the cognate offenses to murder.[10] *Beach,*

---

[10] For example, in *Ora Jones,* this Court concluded that the trial judge erred in not instructing the jury with regard to statutory involuntary manslaughter, but that the error did not require reversal because defendant never requested the instruction. *Id.* at 392-393. However, if the court classified the offense as a necessarily included lesser offense, then the trial judge committed error requiring reversal despite defendant's failure to request the instruction. *People v Chamblis,* 395 Mich 408; 236 NW2d 473 (1975). By not so concluding in *Ora Jones,* we tacitly agreed that statutory involuntary manslaughter falls within the cognate offenses to murder. See also *People v Doss,* 406 Mich 90, 98-99; 276 NW2d 9 (1979) (the presence of malice is the quality that distinguishes murder from manslaughter). In analogous circumstances, we recently classified the statutory offense of killing or injuring a person by careless, reckless, or negligent discharge of a firearm as a cognate lesser included offense to murder. *Beach, supra* at 462-463.

*supra* at 476; *People v Richardson,* 409 Mich 126, 135; 293 NW2d 332 (1980); *People v Van Wyck,* 402 Mich 266; 262 NW2d 638 (1978); *People v Paul,* 395 Mich 444, 449-450; 236 NW2d 486 (1975). Today, we remove any doubt and conclude that statutory involuntary manslaughter is a cognate lesser included offense of murder.

Thus, defendant in the instant case argues that under *Ora Jones,* the trial court should have instructed the jury regarding the lesser offense of statutory involuntary manslaughter because the evidence would support a conviction under the statute. Defendant advances the argument that if the prosecutor does not have to establish "without malice" beyond a reasonable doubt, then the defendant does not have to disprove "without malice" to warrant an instruction regarding the statutory offense. In turn, defendant relies upon *People v Doss,* 406 Mich 90, 98, n 3; 276 NW2d 9 (1979), in which we recognized that the Michigan Criminal Jury Instruction 16:4:06 accurately set forth the elements of statutory involuntary manslaughter:

> (1) That the deceased died on or about a date;
> (2) That the death was caused by an act of the defendant;
> (3) That the defendant caused the death without lawful justification or excuse;
> (4) That the death resulted from the discharge of a firearm;
> (5) That at, the time of such discharge, the defendant was pointing or aiming the firearm at the deceased; and
> (6) That at the time of such discharge, the defendant intended to point or aim the firearm at the deceased.

Defendant argues that because the evidence sup-

ports each element of the applicable criminal jury instruction, the trial court must give the requested instruction. Defendant relies upon two Court of Appeals decisions which held that "the only proof necessary to support the charge [under MCL 750.329; MSA 28.561] was that [the] defendant intentionally pointed the gun at [the decedent] and that she died as a result of the subsequent discharge of the firearm." *People v Germain,* 91 Mich App 154, 159; 284 NW2d 260 (1979), rev'd on other grounds 411 Mich 858 (1981);[11] *People v Michael Fuqua,* 146 Mich App 133, 139; 379 NW2d 396 (1985). Admittedly, if we agree with defendant and the two Court of Appeals decisions, then refusal to give the requested instruction constitutes error in the instant case.

However, even if we agreed with the defendant that he satisfied all the elements of statutory involuntary manslaughter,[12] we disagree that the trial court erred in not instructing the jury on the offense.[13] Rather, we agree with the plaintiff that defendant misinterprets *Ora Jones* and that the Court of Appeals wrongly decided *Germain* and *Michael Fuqua.* Furthermore, we also disagree with the dissent that *Doss* is nearly indistinguishable from the instant case. In *Doss,* we held that

[11] Since writing *People v Germain,* the author of this opinion acknowledges that on readdressing the issue sub judice she believes that her analysis in *Germain* was incorrect.

[12] Plaintiff incorrectly concedes this point.

[13] The dissent claims that we fail to acknowledge and justify our departure from previous precedent set by this Court. The dissent bases its argument upon the premise that "implicit conclusions" constitute binding precedent upon this Court. However, just as obiter dictum does not constitute binding precedent, we reject the dissent's contention that "implicit conclusions" do so. Therefore, we see no basis for the dissent's allegations that we have failed to "acknowledge" or "justify" a departure from prior decisions. Put simply, we have not previously decided the issue before us today, and there is no binding precedent from which we must acknowledge or justify a departure.

the plaintiff does not have to prove "without mal-
ice" in order to establish commission of the alleged
offense. In our opinion, a significant difference
exists between requiring the plaintiff to prove a
negative element and a situation in which the
defendant concedes that he intentionally killed the
victim, but argues that he had a legal justification
for doing so. In the instant case, defendant could
have required the prosecutor to prove that the
defendant had the requisite mens rea for murder
either by not conceding as much or arguing in the
alternative. He chose not to do so. Rather, he
chose to concede an element in order to proceed
with his sole ground for defense. He cannot now
seek reversal on the basis of the trial court's
refusal to instruct the jury on an offense inconsis-
tent with the evidence and defendant's theory of
the case. Thus, the trial court properly refused to
give the requested instruction because the entire
basis of defendant's defense consisted of self-
defense.

In *Ora Jones,* the trial judge instructed the jury
with regard to murder in the second degree and
voluntary manslaughter. The defendant never ob-
jected to these instructions. However, before the
jury began deliberation, defense counsel requested
instructions regarding the statutory offense killing
or injuring a person by careless, reckless, or negli-
gent discharge of a firearm. The trial court refused
to give this instruction. This Court held that the
trial judge erred in refusing to give the instruc-
tion.[14] We also held that the trial court committed
error requiring reversal in giving a misleading
instruction regarding manslaughter because it in-
structed the jury regarding voluntary manslaugh-

---

[14] This Court also held that the trial court did not err in not giving,
sua sponte, an instruction regarding the statutory offense of involun-
tary manslaughter, MCL 750.329; MSA 28.561. *Id.* at 393.

ter, but not involuntary manslaughter. However, the defendant argues that *Ora Jones* stands for the proposition that *anytime* a trial judge instructs the jury with regard to voluntary manslaughter, it must also instruct the jury with regard to involuntary manslaughter. We do not agree.

Rather, in our opinion, a more careful analysis of *Ora Jones* and its progeny reveals that it cannot be construed so broadly. Rather, we draw the rule of *Ora Jones* more narrowly, applying it only when either party offers some evidence consistent with the requested instruction. In *Ora Jones,* the prosecutor argued that the defendant killed the deceased intentionally. The defendant on the other hand, contested that he accidentally killed the deceased. As the Court stated:

> During both his opening statement and closing argument, defense counsel asserted the shooting was accidental. During his closing argument he also alluded to the fact that the jury might find the defendant guilty of manslaughter rather than murder in the second degree. [*Id.* at 385.]

Similarly, the Court stated:

> The prosecutor claimed intentional shooting, the defendant maintained it was accidental. The jury was not obliged to accept either theory but could have concluded that the killing was the result of criminal negligence, e.g., involuntary manslaughter. Had the judge not instructed at all on manslaughter, there would be no reversible error, because no request for instruction on manslaughter was made. See *People v Henry,* 395 Mich 367; 236 NW2d 489 (1975).
>
> Having undertaken to do so, however, it was reversible error to give a misleading instruction which recognized only the prosecution's theory but not the defendant's.

\* \* \*

The defense theory was accidental shooting. The
trial court's instruction did not adequately present
this to the jury. [*Id.* at 393-394.]

Thus, the trial judge in *Ora Jones* erred in not
instructing the jury regarding involuntary man-
slaughter *because defendant produced some evi-
dence consistent with an instruction regarding
involuntary manslaughter,* specifically, that he ac-
cidentally killed the victim. In our opinion, the
rationale of *Ora Jones* makes perfect sense; if the
trial court instructs the jury regarding the defen-
dant's theory of the case, then it must do so
correctly. Otherwise, an instruction only with re-
gard to voluntary "heat of passion" manslaughter
fails to convey the theory of defendant's case to
the jury, that defendant accidentally killed the
deceased. *People v Martin,* 130 Mich App 609; 344
NW2d 17 (1983).

We find the cases which relied upon *Ora Jones*
similarly inapplicable to the facts of the instant
case. For example, in *People v Richardson, supra,*
the defendant argued at trial 'that the deceased
died as the result of the accidental discharge of
the firearm. The trial judge instructed the jury
regarding first- and second-degree murder and vol-
untary manslaughter. Defendant requested in-
structions regarding manslaughter and careless
discharge of a firearm. The trial judge instructed
the jury only with regard to the additional offense
of voluntary manslaughter. The *Richardson* Court
concluded that the trial court erred. As the Court
stated,

In the present case the prosecutor's theory was
that the defendant, with premeditation, delibera-
tion, and malice, intentionally killed Paul Cook.

The defense case offered, in differing measures, ingredients of provocation, *accident, self-defense,* and *"criminal" negligence of the kind that attends involuntary manslaughter.* Our review of the record convinces us that there was evidence presented . . . which would have supported a conviction of involuntary manslaughter. [*Id.* at 136-138. Emphasis added.][15]

See also *People v Arthur Jones,* 419 Mich 577; 357 NW2d 837 (1984); *People v West,* 408 Mich 332, 343; 291 NW2d 48 (1980); *People v Paul, supra; Martin, supra; People v Jones,* 76 Mich App 601, 604-605; 257 NW2d 185 (1977). Cf. *People v King,* 98 Mich App 146; 296 NW2d 211 (1980) (some evidence of provocation is needed before it is error to refuse a request regarding voluntary manslaughter). The defendant in each of these cases presented some evidence consistent with the crime of involuntary manslaughter.

However, in the instant case, defendant never argued that he accidentally or unintentionally killed Rich Petersen. Rather, he steadfastly maintained throughout the trial that he shot and killed the victim in self-defense. In Michigan, the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm. *Doss, supra* at 102-103; *People v Lenkevich,* 394 Mich 117, 124; 229 NW2d 298 (1975); *People v Giacalone,* 242 Mich 16, 21-22; 217 NW 758 (1928); *People v Macard,* 73 Mich 15, 20; 40 NW 784 (1888); *People v Pond,* 8 Mich 150, 175 (1860); *People v Garfield,* 166 Mich App 66, 76-77; 420 NW2d 124

---

[15] Even *People v Rochowiak,* 416 Mich 235, 243; 330 NW2d 669 (1982), which this Court recently has questioned, stated that, "*Ora Jones* is distinguishable as a case where the defense theory was accident."

(1988); *People v Green,* 113 Mich App 699, 704; 318 NW2d 547 (1982); *People v Oster,* 67 Mich App 490, 501; 241 NW2d 260 (1976); *People v Perez,* 66 Mich App 685, 692; 239 NW2d 432 (1976); *People v Shelton,* 64 Mich App 154, 156-157; 235 NW2d 93 (1975).[16] A finding that a defendant acted in justifiable self-defense necessarily requires a finding that the defendant acted intentionally, but that the circumstances justified his actions. *People v Plozai (On Remand),* 139 Mich App 802, 809-810; 362 NW2d 867 (1984) (the defendant admitted killing the deceased in self-defense; "[u]nlike *Richardson,* where the shooting was claimed to be unintended because it was accidental, defendant in the present case made no claim that his actions were anything but intentional").

Conversely, a defendant who relies entirely upon the defense of self-defense cannot expect the trial judge to instruct the jury regarding statutory involuntary manslaughter, a crime neither supported by the evidence nor presented to the jury by the defendant or the prosecutor. *People v Carter,* 387 Mich 397, 422-423; 197 NW2d 57 (1972); *People v Heard,* 103 Mich App 571; 303 NW2d 240 (1981); *People v Livingston,* 63 Mich App 129, 134-135; 234 NW2d 176 (1975). A holding to the con-

---

[16] Several older decisions stated that a defendant must only "honestly" believe that his life is in imminent danger or that there is a threat of death or serious bodily harm. *People v Lennon,* 71 Mich 298, 300-301; 38 NW 871 (1888); *People v Burkard,* 374 Mich 430, 438; 132 NW2d 106 (1965); *People v Deason,* 148 Mich App 27, 31; 384 NW2d 72 (1985); *People v Robinson,* 79 Mich App 145, 156-161; 261 NW2d 544 (1977). Apparently, the dissent believes that this Court has not recently addressed the issue whether the defendant must "honestly and reasonably" or only "honestly" believe his life is in imminent danger. However, in our opinion, this Court addressed and held in *Doss* that a defendant must "honestly and reasonably" believe his life is in imminent danger to avail himself on the theory of self-defense. We adhere to *Doss* and those decisions which require both an "honest and reasonable" belief. Furthermore, if "reasonableness" is not an additional element of self-defense, then the "unreasonableness" of defendant's beliefs should not mitigate murder to manslaughter.

trary defies both logic and common sense. We do not imply that a defendant may not maintain inconsistent defenses. However, a trial court need not instruct the jury on inconsistent theories when neither party produces a modicum of evidence in support of a particular theory.[17] As this Court stated in *Carter,* "[i]n a criminal case, if there is a request to charge as to a lesser included offense, but there is no evidence of such a lesser included offense, or the facts are such that the court or the jury would be obliged to conclude that the defendant was guilty of the offense charged or not guilty, no charge as to a lesser included offense need be given." *Id.* at 422-423. We agree and so hold. Otherwise, the jury conceivably could convict a defendant of a lesser crime upon the basis of factors inconsistent with and wholly unrelated to the evidence introduced at trial.

In our opinion, in promulgating the involuntary manslaughter statute, the Legislature intended to punish the intentional pointing of a firearm which results in death even though the defendant did not act with the criminal intent sufficient for conviction under common-law involuntary manslaughter. *People v Maghzal,* 170 Mich App 340, 345; 427 NW2d 552 (1988); *People v Duggan,* 115 Mich App 269, 272; 320 NW2d 241 (1982). For example, the Court of Appeals recently addressed the purpose of statutory involuntary manslaughter:

The general rule appears to be that, when a person points a gun at someone as a joke, reason-

[17] Similarly, this Court has held that a defendant was not entitled to an instruction on self-defense when the trial court instructed the jury on murder and manslaughter because the defendant denied committing the homicide. *People v Droste,* 160 Mich 66, 80; 125 NW 87 (1910). See also *People v Trammell,* 70 Mich App 351, 355; 247 NW2d 311 (1976) (the defendant argued that he accidentally killed the victim and, therefore, the trial judge did not err in giving, sua sponte, an instruction on self-defense).

ably believing the gun not to be loaded, and pulls the trigger and the gun discharges and kills the victim, he is guilty of manslaughter. 40 Am Jur 2d, Homicide, § 95, p 390. [*Maghzal, supra* at 345.]

In *Maghzal,* the defendant killed her husband when she jokingly pointed and fired a gun at him. The defendant stated that she took the clip out and thought the gun was empty. In a bench trial, the trial court considered the crime of second-degree murder, but refused the defendant's request to consider common-law and statutory involuntary manslaughter. The Court of Appeals reversed and held, "[t]he defense theory was accidental shooting; defense counsel argued the two lesser offenses in closing argument. We rule that the factfinder must address those theories argued by defendant and which were supported by the facts." *Id.* at 347. We agree with the Court of Appeals application of statutory involuntary manslaughter as applied to the facts of *Maghzal.*

Conversely, in the instant case, we hold that the trial judge did not err in refusing to instruct the jury regarding the offense of statutory involuntary manslaughter even though it instructed the jury regarding voluntary manslaughter. We reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

### B. PEOPLE v LANDRUM

Our analysis begins first with the issue whether the trial court erred in failing to instruct the jury, sua sponte, regarding common-law involuntary manslaughter in the instant case. The circuit judge instructed the jury as to second-degree murder and, sua sponte, as to voluntary manslaughter. The trial court refused to instruct the jury regarding common-law involuntary manslaughter. Defen-

dant never objected to these instructions. Defendant concedes that if the trial judge did not instruct the jury, sua sponte, regarding voluntary manslaughter, then he would not have to instruct the jury regarding common-law involuntary manslaughter. However, defendant argues that once a trial judge instructs a jury, sua sponte, regarding voluntary manslaughter, he must also instruct the jury regarding common-law involuntary manslaughter. We disagree.

In *Heflin,* we concluded that even if defendant requested an instruction with regard to a cognate lesser included offense, the trial judge must only issue the lesser included offense instruction when the evidence adduced at trial would support a conviction of that crime. We relied upon *Ora Jones,* in which this Court held that the trial court erred in not instructing regarding involuntary manslaughter even though the defendant never requested the instruction because the trial court's instruction did not accurately reflect defendant's theory of the case. *Ora Jones, supra* at 393-394; see also *Richardson, supra* at 137-138; *Martin, supra.* We find *Ora Jones* equally applicable in the instant case. Thus, we must determine whether defendant introduced evidence at trial that would support a conviction of involuntary manslaughter. If she did, then the trial judge must instruct the jury regarding common-law involuntary manslaughter.[18] *Ora Jones, Arthur Jones, Chamblis,*

[18] Additionally, we reject plaintiff's request to overturn *People v Arthur Jones, supra.* In *Arthur Jones,* we held that the trial court erred in not instructing the jury regarding involuntary manslaughter because the defendant introduced some evidence by "accident." Plaintiff wants this Court to adopt the position advocated by the dissent which focused upon whether the defendant requested the instruction on involuntary manslaughter. While the defendant should request the instruction regarding involuntary manslaughter under the circumstances in the instant case, this does not diminish the trial judge's duty to issue the requisite lesser included instruction when supported by the evidence and consistent with defendant's theory of the case.

and *Heard, supra.*

Defendant's assertion that the evidence supported the crime of involuntary manslaughter presents a narrow issue of first impression for this Court, specifically, whether Michigan will recognize the doctrine of "imperfect" or "qualified" self-defense as a means of mitigating murder to involuntary manslaughter.

Generally, other jurisdictions apply imperfect self-defense to situations in which defendant acted in self-defense, but with excessive force, or as the initial aggressor. *People v Morin,* 31 Mich App 301, 311, n 7; 187 NW2d 434 (1971) (LEVIN, J.); *People v Deason,* 148 Mich App 27, 31-32; 348 NW2d 72 (1985); *State v Powell,* 84 NJ 305, 313; 419 A2d 406 (1980); Perkins & Boyce, Criminal Law (3d ed), pp 1137-1143. Some Michigan Court of Appeals panels would limit application of the doctrine to the latter situation. *People v Amos,* 163 Mich App 50; 414 NW2d 147 (1987); *People v Vicuna,* 141 Mich App 486; 367 NW2d 887 (1985); *People v Springer,* 100 Mich App 418; 298 NW2d 750 (1980). In the instant case, defendant admits that she killed Thomas in self-defense, but she argues that she used excessive force and, therefore, accidentally killed Thomas.

In Michigan, " 'involuntary manslaughter is the unintentional killing of another without malice in (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm, or (2) the

Conversely, we reject defendant's contention that we should require the trial judge to instruct the jury regarding involuntary manslaughter *anytime* the court instructs the jury regarding voluntary manslaughter. We have recognized that voluntary and involuntary manslaughter quite often arise out of different factual scenarios. *People v Townes,* 391 Mich 578; 218 NW2d 136 (1974). Accordingly, the evidence adduced at trial must be the determinative factor in deciding whether to issue an instruction.

commission of some lawful act, negligently performed or (3) in the negligent omission to perform some legal duty.' " *Beach, supra* at 477; *Richardson, supra* at 135-136; *People v Townes,* 391 Mich 578, 590-591; 218 NW2d 136 (1974). As applied in the instant case, defendant contends that the trial court erred in not instructing the jury regarding common-law involuntary manslaughter, asserting that the second definition is implicated. " 'Involuntary manslaughter is the unintentional killing of another without malice in . . . the commission of some lawful act, negligently performed . . . .' "[19] *Beach, supra* at 477. While we agree that the imperfect self-defense theory[20] has yet to be considered by this Court, we do not agree that adoption of the theory would require an instruction regarding common-law involuntary manslaughter in this matter.

As we stated in *Heflin, supra,* "the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." Thus, an act committed in self-defense which conforms to

[19] Defendant does not argue that the facts of the instant case fall within the "unlawful act" definition of involuntary manslaughter. Even assuming that the defendant had so argued, we would be constrained to disagree with her under the facts of the instant case. The defendant killed Thomas by repeatedly bludgeoning him to death with a telephone, a bottle, and a leg of a table. These acts either constituted a felonious act (assault with a dangerous weapon) or an act naturally tending to cause great bodily harm (assault with intent to do great bodily harm). Therefore, as we concluded in *Beach,* the nature of the underlying act precludes characterization of the offense in the instant case as involuntary manslaughter.

[20] Our order granting leave to appeal excluded argument regarding the doctrine of imperfect self-defense. However, in light of statements made at oral argument, in addressing the first issue that we granted leave to appeal to consider, "whether the trial court erred in not giving, sua sponte, an instruction on the offense of involuntary manslaughter," we must briefly address the doctrine of imperfect self-defense insofar as it applies to the facts of the instant case.

this definition constitutes a lawful act. However, an act committed in self-defense but with excessive force or in which defendant was the initial aggressor does not meet the elements of lawful self-defense.[21] Therefore, by definition, "imperfect self-defense" is an unlawful act that does not fall within the definition of common-law involuntary manslaughter: *a lawful act* negligently performed. We would so hold.[22]

Lastly, we address the issue whether the trial court's instruction regarding self-defense adequately presented the defendant's claim of self-defense to the jury. The trial court's instruction complied with the criminal jury instruction that permits the use of deadly force in self-defense. CJI 7:9:01.[23] Defendant never objected to this instruc-

[21] The dissent's analogy of the instant case to *People v Jackson,* 390 Mich 621; 212 NW2d 918 (1973), is misplaced. *Jackson* involved a situation in which the defendant aimed his gun at his adversary but missed and hit an innocent bystander. Thus, *Jackson* involved the shooting of the bystander and not the person at which the defendant aimed. Had defendant shot his adversary in proper self-defense, and not the bystander, then he would be guilty of no crime. We justify the disparate treatment of these offenses on the ground that the defendant may have an entirely different mental pattern with regard to his intent to kill his adversary versus the bystander. On the other hand, *Jackson* would be analogous to the instant case if the defendant intentionally killed his adversary, but not in proper self-defense.

[22] Defendant in *Heflin* cites several cases for the proposition that should require an instruction regarding involuntary manslaughter. *People v Clark,* 130 Cal App 3d 371, 381-382; 181 Cal Rptr 682 (1982); *State v Denny,* 27 Ariz App 354; 555 P2d 111 (1976). However, a review of these cases illustrates that in each case, the defendant not only argued self-defense, but also "accidental killing." Rather, the majority of jurisdictions that recognize "imperfect self-defense" use it as a method of negating the element of malice in a murder charge. These jurisdictions assimilate it with voluntary manslaughter committed in the "heat of passion" which also negates the malice element of murder. Consequently, in these jurisdictions, "imperfect self-defense" mitigates murder to voluntary manslaughter.

[23] (1) One of the defenses raised in this case is that the defendant acted in lawful self-defense. The law recognizes the right of a person to use force or even to take a life in defense of his own person under certain circumstances. When a person acts in lawful self-defense, such actions are excused and the defendant is not guilty of any crime.

tion. Although the jury instructions require the trial judge to instruct the jury that the defendant may use deadly force if threatened with impending death or bodily harm, they do not require the trial judge to specifically inform the jury that the defendant may use deadly force to repel a potential forcible rape.

Over a century ago, this Court equated common-law rape with the most atrocious felonies. *People v Pond, supra* at 181-182. One could even argue that

---

(2) In considering whether or not the defendant acted in lawful self-defense, you should carefully consider all of the evidence in light of the following rules:

(3) First, at the time of the act the defendant must honestly believe that he is in danger of being killed or of receiving serious bodily harm. If he so believes, he may immediately act and defend himself, even to the extent of taking human life if necessary. Although it may now turn out that the appearances were false and that he was mistaken as to the extent of the real danger, he is to be judged by the circumstances as they appeared to him at the time of the act.

(4) Second, the degree of danger which must be feared is serious bodily harm or death. A person is not justified in killing or inflicting great bodily injury upon another in order to protect himself from what appears to be slight or insignificant injury. In deciding whether at the time the defendant feared for his life or safety, you should consider all of the surrounding circumstances: [the condition of the parties, including their relative strength/whether the other party was armed with a dangerous weapon or had other means to injure the defendant/the nature of the threat or attack of the other party/previous acts of brutality or threats of the other party of which the defendant was aware].

(5) Third, the act or acts taken by the defendant must have appeared to the defendant at the time to be immediately necessary. A person is justified in using only such an amount of force as may appear necessary at the time to defend himself from danger. In considering whether the degree of force appeared to be necessary, you should consider the excitement of the moment and what alternatives the defendant knew existed. A defendant in a state of excitement is not held to fine distinctions of judgment about how much force is necessary for him to use to protect himself. [CJI 7:9:01.]

The jury instructions only require an "honest" belief. However, as we stated in *Heflin, supra,* a "defendant [must] *honestly and reasonably* believe[ ] that his life is in danger or that there is a threat of serious bodily harm."

common-law rape was the ultimate intrusion that one person forces upon another. The victim suffered the strong likelihood of irreparable physical and psychological harm. Kates & Engberg, *Deadly force self-defense against rape,* 15 U Cal Davis L R 873 (1982). Only an archaic system of justice would suggest that a woman cannot use deadly force to defend herself against common-law rape. Therefore, it necessarily follows that a woman who fears being raped, also fears the threat of serious bodily harm. Not surprisingly, the defendant[24] requests that this Court adopt a rule which would require the trial court to instruct the jury per se that a defendant may employ self-defense to repel a potential forcible rape.[25]

However, neither party recognizes the difficulties the trial judges would have imposing such a broad rule.[26] The Legislature codified and expanded

[24] The Women Lawyers Association of Michigan filed an amicus curiae brief. For purposes of simplicity, we reference their arguments to defendant.

[25] The plaintiff apparently concedes this, but contends that the trial court adequately instructed the jury on self-defense in the instant case.

[26] The dissent apparently recognizes the problem trial judges would have in deciding which statutory provisions of criminal sexual conduct would require an instruction of a defendant's right to use deadly force under the longstanding doctrine of self-defense. However, rather than attempt to apply the doctrine as it exists to the facts of a particular case, the dissent redefines the rule as it applies to all criminal sexual conduct. The dissent bases its decision upon the following analogy: "[t]his Court has the luxury of interpreting common-law formulations to reach a correct result. The Court can say that a tomato is a vegetable even though it is a fruit." *Post,* p 557 (LEVIN, J.).

In other words, the dissent believes that this Court can call something that which it is not. Although nobody disagrees that "rape" is one of the most reprehensible crimes, we cannot agree with the dissent that we should create a different and special rule that would allow the use of deadly force to any and all allegations of criminal sexual conduct. While the dissent's proposed rule may be socially appealing, we believe it sets dangerous legal precedent. For example, what happens in a case involving self-defense of another? Under traditional notions of this doctrine, the third party steps into the

common-law rape into varying degrees of "criminal sexual conduct" in 1974. MCL 750.520a *et seq.*; MSA 28.788(1) *et seq.*[27] Unlike common-law rape, under these statutory provisions, forcible criminal sexual conduct may arise from circumstances in which the victim never had an honest and reasonable belief that his life is in imminent danger or threat of serious bodily harm. See, e.g., MCL 750.520b(1)(f)(iii), 750.520d(1)(b); MSA 28.788(2)(1)(f) (iii), 28.788(4)(1)(b). Rather than specify each and every statutory definition of criminal sexual conduct that would mandate an instruction regarding self-defense, we would hold that a person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm. This instruction addresses the delicate balance between the well-established doctrine of self-defense on the one hand, and the extremely egregious and personally intrusive crime of criminal sexual conduct on the other. Accordingly, we would hold that a trial court should instruct the jury that a person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the

shoes of the individual threatened. However, under the dissent's proposed rule, it would seem that a person who overhears a man threaten a woman with future injury if she does not consent to sexual intercourse would be justified in killing the threatening person. Although we doubt the dissent intends this result, it is the logical extension of its rule in the instant case. Of course, we suppose that just as the dissent created a special rule of self-defense to meet all the statutory crimes of criminal sexual conduct, it could also conclude that the special rules it adopts today only apply to a woman being attacked. As the dissent states, "[t]his Court can say that a tomato is a vegetable even though it is a fruit." In our opinion, rather than altering the law in the instant case, we prefer to apply it in a consistent and workable manner, while at the same time making sure that those threatened with criminal sexual conduct have the ability to defend themselves with the amount of force necessary under the circumstances.

[27] 1974 PA 266.

person reasonably believes could result in imminent death or serious bodily harm.

However, our resolution of this broader issue does not resolve the specific issue upon which this Court granted leave to appeal: "whether the trial court's instruction adequately presented the defendant's claim of self-defense to the jury." Defendant never objected to the trial judge's issuance of the criminal jury instruction. Consequently, we will only reverse the decision of the trial court if it resulted in manifest injustice. *People v Kelly,* 423 Mich 261; 378 NW2d 365 (1985). We would hold that it did not.

Plaintiff persuasively argues that the trial judge and counsel adequately instructed the jury that rape constitutes serious and imminent bodily injury. Defense counsel focused his voir dire inquiry upon the issue whether any potential juror had difficulty in returning a verdict of not guilty when defendant, a prostitute, used deadly force in self-defense to defend against a rapist. Most significantly, defense counsel reemphasized this point during closing arguments:

> I asked you, ladies and gentlemen, is there any question in the minds of any one of you as to whether there could be a rape or an attempted rape of a prostitute and you all indicated by your silence that yes, there can be, and you are right. *I asked you if there was any question in your mind as to whether or not rape is an act of great bodily harm.* I submit to you that each of you, using your common sense, would definitely say yes. *The rape of any woman, ladies and gentlemen, can cause her not only great bodily harm and mental harm, but it may last for a lifetime.*
>
> \* \* \*
>
> Let's get to the meat of this thing, and I certainly don't intend to take a great deal of time in

*my talking with you. There is no question but that Henry Green Thomas died and is a probability that he, himself, fell in the tub and there is also that reasonable possibility that the acts of Celestine Landrum, what she did, may have caused or contributed to the death of Henry Green Thomas. What she did, did she have a right to do? There again, I stated to you that defending herself against a rape or an attempted rape is an absolute right and if she did so in order to prevent that rape or in order to prevent great bodily harm, the Court will instruct you that then she had a right to do anything that she could do even to the point of taking a life.* [Emphasis added.]

In our opinion, these statements, the conformity of the trial court's self-defense instruction to the criminal jury instructions, the tenor of the entire trial court proceeding, and defendant's failure to object to the issuance of these instructions, adequately presented defendant's theory of self-defense to the jury in the instant case.[28] We do not believe that the instruction in the instant case resulted in the type of manifest injustice that this Court contemplated in *Kelly* when it stated that " '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *Kelly, supra* at 272; *Henderson v Kibbe,*

---

[28] We reject defendant's contention that the prosecutor misled the jury during closing arguments when he argued that defendant did not act in self-defense, but rather murdered Thomas for money. Plaintiff argued throughout the trial that defendant beat Thomas to death because he would not pay her for having sex with him, not because she feared serious bodily harm or being raped. Defendant argued that defendant acted in self-defense. It is not surprising that the prosecutor stressed the facts which best supported his theory of the case; whereas, defendant argued those which supported her theory of the case. However, this does not mean that the jury did not receive instructions which adequately apprised them of defendant's theory of self-defense. The trial court and defendant made sure the jury understood defendant's right to use deadly force under the facts of the instant case.

431 US 145, 154; 97 S Ct 1730; 52 L Ed 2d 203 (1976).

Accordingly, we reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

In *Heflin,* BRICKLEY, BOYLE, and GRIFFIN, JJ., concurred with RILEY, C.J.

In *Landrum,* GRIFFIN, J., concurred with RILEY, C.J. BRICKLEY and BOYLE, JJ., concurred in the result only.

BRICKLEY, J. I concur in the reasoning and result of the opinion of the Chief Justice in *People v Heflin.* I concur in the result in *People v Landrum,* but write separately to indicate a somewhat different analysis.

In *People v Landrum,* to the extent that the defendant is entitled to an instruction regarding involuntary manslaughter sua sponte,[1] the fact that the jury passed over a voluntary manslaughter instruction and found the defendant guilty of second-degree murder indicates it had no misgivings about the defendant's malice. Although the defense of excessive force in the execution of self-defense was, in my judgment, more in keeping with involuntary manslaughter than voluntary manslaughter, the jury could have settled on voluntary manslaughter because it would not necessarily have been inconsistent with the evidence presented in the case. I therefore find no manifest injustice in the failure to give this instruction.

I also find no manifest injustice in any deficiency in the unobjected to self-defense instruction for the reasons set forth in the analysis of the Chief Justice.

[1] See *People v Arthur Jones,* 419 Mich 577; 358 NW2d 837 (1984) (BOYLE, J., dissenting).

I therefore concur in the reversal of the Court of Appeals in both cases.

BOYLE, J. I concur in the majority's reasoning and in the result reached in *People v Heflin.* I also concur in the affirmance of the decision of the trial court in *People v Landrum*; however, I write separately because I believe that the defendant in *People v Landrum,* having failed to request an involuntary manslaughter instruction, or to object to the omission of such instruction, is precluded from claiming error by the absence of such instruction. *People v Jones,* 419 Mich 577, 581; 358 NW2d 837 (1984) (BOYLE, J., dissenting). Had the involuntary manslaughter instruction been requested and refused in *Landrum,* I would agree with both the reasoning and the result of the majority opinion.

ARCHER, J. (*concurring in part and dissenting in part*).

I

I agree with the result reached by the majority in *People v Heflin.* The trial court did not err in refusing to instruct the jury regarding statutory involuntary manslaughter.[1] Such an instruction is not required merely because the trial court instructs with regard to voluntary manslaughter. There must be evidence in the record to support a finding of the elements of statutory involuntary manslaughter in order to require the instruction. *People v Ora Jones,* 395 Mich 379, 390; 236 NW2d 461 (1975).

As defined in MCL 750.329; MSA 28.561, statutory involuntary manslaughter is a very narrow

---

[1] MCL 750.329; MSA 28.561.

criminal offense which is applicable only where it can be shown that the victim died as a result of a wound from a weapon intentionally aimed but accidentally discharged. In the instant case, the evidence clearly indicates that the defendant intended to shoot the decedent, Rick Petersen. There was no evidence that the defendant accidentally or unintentionally killed Mr. Petersen. Accordingly, on the basis of the evidence adduced at trial, there was no requirement that the trial judge present a jury instruction regarding statutory involuntary manslaughter.

II

In *People v Landrum,* I respectfully dissent. We granted leave to appeal in this case limited to the issues (1) whether the trial court erred in not giving, sua sponte, an instruction regarding the offense of common-law involuntary manslaughter; (2) if so, whether the error was harmless; and (3) whether the trial court's instructions adequately presented the defendant's claim of self-defense to the jury. We expressly determined not to entertain argument regarding the doctrine of imperfect self-defense.[2]

I would hold that the trial court's instructions did not adequately present defendant's theory of the case to the jury. Defendant was entitled to have the jury instructed with regard to involuntary manslaughter. The jury also should have been instructed that the defendant had the right to use the force required to repel the attempted rape. Failure to give the appropriate instructions resulted in prejudice to the defendant. Consequently, the error cannot be deemed harmless.

[2] *People v Landrum,* 431 Mich 906 (1988).

III

In Michigan, common-law involuntary manslaughter is defined as the killing of another without malice and unintentionally by:

a. Doing some unlawful act not amounting to a felony nor tending to cause death or great bodily harm; or

b. Negligently doing some act lawful in itself; or

c. Negligent omission to perform a legal duty.

*People v Beach,* 429 Mich 450, 477; 418 NW2d 861 (1988); *People v Townes,* 391 Mich 578, 590-591; 218 NW2d 136 (1974); *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923).

Common-law involuntary manslaughter is a cognate, but not necessarily included, lesser offense of the crime of murder. As the Court stated in *People v Townes, supra,* 589-590:

Both [voluntary manslaughter and common-law involuntary manslaughter] proscribe the unlawful killing of another without legal justification or excuse and are distinguished from the higher crimes of murder by the absence of malice. . . . Beyond these similar elements, however, voluntary and involuntary manslaughter are distinct and separate offenses.

* * *

The elements of involuntary manslaughter, although not completely exclusive of those found in voluntary manslaughter, are distinguishable in several respects. They define a crime that originates out of circumstances often quite different from those found in voluntary manslaughter and apply to a defendant who did not proceed with the intent to cause death or serious bodily injury. [Citations omitted.]

Cognate offenses must be analyzed differently than necessarily included lesser offenses. *People v Ora Jones, supra,* 389-390. Although they share some elements with necessarily included lesser offenses, cognate offenses inherently comprise elements that are not encompassed within the primary offense or its necessarily included lesser offenses. In order to determine whether there is sufficient evidence to present a jury instruction on a cognate offense, a trial court must independently determine whether the unique elements of that offense are present. *People v Beach, supra,* 463-464.

In the instant case, the majority errs when it merely reviews the evidence to determine if the defendant's actions constitute lawful self-defense as a justification for homicide.[3] Defendant's primary theory of self-defense did not preclude alternative theories involving cognate lesser offenses. In this case, the defendant's testimony and theory of the case raised the question whether defendant was, in the alternative, merely guilty of involuntary manslaughter as a result of negligent performance of the lawful act of defense against forcible rape.

In *People v Arthur Jones,* 419 Mich 577; 358 NW2d 837 (1984), the defendant was convicted by a jury of second-degree murder and possession of a firearm during the commission of a felony. The issue was whether the trial court, having undertaken sua sponte to instruct the jury regarding voluntary manslaughter, was also required to instruct regarding involuntary manslaughter. The defendant had not directly raised the defense of accident at trial. There was testimony, however, that immediately following the shooting the defen-

---

[3] See *ante,* pp 508-509.

dant mumbled, "It was an accident. God knows, it was an accident. It just went off." The Court found that in light of the testimony the defense of accident "was properly within the jury's contemplation."[4] It affirmed the Court of Appeals reversal of the defendant's conviction.[5]

The situation before this Court today is very similar to that in *People v Arthur Jones.* Although the defendant did not expressly argue accident, the main thrust of her defense was that she had never meant to kill the defendant or even seriously injure him. She was merely trying to avoid being raped.

Defendant testified that she met Henry Thomas at a bar almost a week prior to his death. Thomas told her he would like to have sex with her, but that he did not have any money. The next time they met, Thomas told her that he had money and wanted to go home with her. They left the bar, bought some liquor, and went to his house. They poured drinks, talked, and played records. Thomas drank heavily.

The fatal struggle began when Thomas was ready to go to bed and asked defendant to undress. She asked to be paid the $30 they had agreed upon. The decedent refused and asked her to dance some more. After a while, Thomas pushed her toward the bedroom, and told her that he was not going to pay her, but that they were still going to have sex. Defendant asked to be taken home. Thomas refused, got angry, and ordered her to take off her clothes, saying that they were either going to "fuck or fight." Scared and afraid, defendant undressed. She was ordered to get into bed and lay on her back. She complied.

---

[4] 419 Mich 580.

[5] *Id.*

Thomas took his clothes off. He threatened to hurt her if she did not have sex. As Thomas went to climb on top of her, defendant reached for the phone and hit him with it. She jumped out of bed and tried to get away, but he grabbed her. He knocked her to the floor. She grabbed a table and hit him.

Defendant tried to get away, and they fought throughout the house. She retreated into the bathroom. He tried to force his way in. Defendant stepped aside, and he flew in, falling into the tub. He grabbed her. She tried to fight him off. He kept hitting and kicking her. She grabbed a Pine-Sol bottle and hit him with it. The bottle shattered. Thomas kept coming. She began to hit him with the telephone handle. Finally, he stopped the attack and laid down in the tub. Defendant got dressed and left.

The defendant testified that she was only trying to subdue the decedent enough so that she could escape. She also testified that when she left the decedent's home he was alive. On that basis, in order to decide whether an instruction on involuntary manslaughter (in this case, negligent performance of a lawful act) was required, this Court must determine whether there is evidence to support a finding that defendant was engaged in a lawful act (attempting to repel a forcible rape) but performed it in a negligent manner (use of excessive force).

Although defendant was arguably grossly negligent in using excessive force while trying to repel the decedent's unwanted sexual advances, the prosecution does not dispute that the defendant had the right to use the amount of force required to repel these advances. Further, there was no conflicting eyewitness testimony to rebut defendant's claim that she was merely using the force

she felt was required to escape. Accordingly, on
the basis of the evidence, it was appropriate for
the court to instruct the jury regarding involun-
tary manslaughter. Given the appropriate instruc-
tion, it would have been possible for the jury to
infer from the testimony that the defendant negli-
gently used excessive force.

IV

HARMLESS ERROR ANALYSIS

The doctrine of "harmless error" is stated in
both court rule[6] and statute.[7] The essence of this
doctrine has been stated by this Court as follows:
"[A]ppellate courts should not reverse a conviction
unless the error was prejudicial." *People v Robin-
son,* 386 Mich 551, 562; 194 NW2d 709 (1972).
Thus, the second step of the inquiry is to deter-
mine whether the instructional error that oc-
curred below may be deemed prejudicial in light of
the jury's verdict of guilty of a higher offense

[6] MCR 2.613(A) provides:

Harmless Error. An error in the admission or the exclusion
of evidence, an error in a ruling or order, or an error or defect
in anything done or omitted by the court or by the parties is
not ground for granting a new trial, for setting aside a verdict,
or for vacating, modifying, or otherwise disturbing a judgment
or order, unless refusal to take this action appears to the court
inconsistent with substantial justice.

[7] The Code of Criminal Procedure provides:

No judgment or verdict shall be set aside or reversed or a
new trial be granted by any court of this state in any criminal
case, on the ground of misdirection of the jury, or the improper
admission or rejection of evidence, or for error as to any matter
of pleading or procedure, unless in the opinion of the court,
after an examination of the entire cause, it shall affirmatively
appear that the error complained of has resulted in a miscar-
riage of justice. [MCL 769.26; MSA 28.1096.]

where the option was available to convict of a necessarily included lesser offense.

In *People v Beach,* this Court set forth the circumstances under which an erroneous failure to instruct a jury regarding a cognate lesser included offense could be deemed harmless, thereby negating the need for a new trial. The Court held that failure to instruct the jury regarding a cognate lesser offense is harmless error "where the jury had the choice of a lesser offense and rejected it in favor of conviction of a higher offense" if rejection by the jury "would necessarily have to indicate a lack of likelihood that the jury would have adopted the lesser requested charge." *People v Beach, supra,* 491, 493.

In the instant case, the jury convicted defendant Landrum of second-degree murder rather than voluntary manslaughter, a necessarily included lesser offense on which the jury had been instructed. If we were to mechanically apply the holding in *People v Beach,* without engaging in a thorough analysis of its rationale, we would automatically hold that, even if defendant was entitled to an instruction regarding involuntary manslaughter, as found in part III, the failure to give that instruction was harmless error.

Unless *Beach* is carefully applied, whenever a defendant is convicted of second-degree murder, there can be no reversal and retrial on the basis of failure to give an instruction regarding involuntary manslaughter, as long as the jury was instructed with regard to any necessarily included lesser offense. This result would obscure the distinction between cognate lesser offenses and necessarily included lesser offenses. Due process of law requires that members of the jury be presented with a full range of applicable jury instructions on the basis of the evidence adduced at trial, includ-

ing the unique elements of relevant cognate lesser offenses so that the jury verdict fairly corresponds to the evidence presented by the parties.

There are circumstances where a jury can convict of second-degree murder, implicitly finding malice, where failure to give an instruction regarding involuntary manslaughter is quite prejudicial to the defendant. The requisite prejudice exists in this case where the array of options available to the jury was truncated, so that deliberations were potentially affected by confusion regarding the element of specific intent and the effect of mitigating factors[8] as they related to the altercation between the defendant and Mr. Thomas, because of failure to present instruction regarding a relevant cognate offense.

Writing for the Court in *Beach, supra,* 491, Justice BRICKLEY expressly recognized that rejection by the jury of a necessarily included lesser offense should not automatically result in a finding of harmless error:

> The existence of an intermediate charge that was rejected by the jury does not, of course, automatically result in an application of the *Ross* [*People v Herbert Ross,* 73 Mich App 588; 252 NW2d 526 (1977)] analysis. For it to apply, the intermediate charge rejected by the jury would necessarily have to indicate a lack of likelihood that the jury would have adopted the lesser requested charge.
>
> We note that our recent cases, which did not adopt or apply the harmless error analysis, are distinguishable. In *People v Richardson* [409 Mich

---

[8] In this context, "mitigating factors" may be a misnomer in that mitigation is not an element of common-law involuntary manslaughter. Actually, it is the defendant's right to defend herself against forcible rape that roughly corresponds to a mitigating factor as it would relate to the necessarily included lesser offense of voluntary manslaughter.

126; 283 NW2d 332 (1980)], the Court declined to
apply a harmless error analysis because the re-
fusal to instruct was reasoned to foreclose the
jury's option to convict the defendant consistently
with his own testimony, evidence, and theory.
*Beach* differs because the defense theory was alibi,
and no evidence to make a theory of larceny
essential to the defense was provided, that is,
there was no specific denial of the use of force.
There was only an alibi defense and an inference
built on a possibility that the jury might disbelieve
part of Turner's testimony.

The *Beach* Court quoted *People v Rochowiak,*
416 Mich 235, 248-249; 330 NW2d 669 (1982), in
which Justice LEVIN set forth suggested circum-
stances where harmless error could be found.[9]

> As in *Richardson,* we do not hold that failure to
> give lesser offense instructions can never be harm-
> less. The error may indeed be harmless in a case
> where it is clear that the jury was presented with
> a lesser offense or offenses consistent with the
> defendant's theory which was rejected, and made
> findings of fact, implicit in the verdict, which
> would preclude conviction of the charge upon
> which an instruction was refused, or where the
> differences between the various offenses concern
> factual elements, the existence of a weapon (armed
> or non-armed), the completion of the offense (at-
> tempt), the use of force (larceny or robbery) and
> not the state of mind of the defendant (murder,
> manslaughter, reckless use; assault with intent to
> murder, with intent to commit great bodily harm
> less than murder, felonious assault).

In the instant matter, although defendant's first
line of defense was self-defense, there was also

---

[9] The *Beach* majority expressly declined to adopt the qualifications
set forth in *People v Rochowiak* for finding of harmless error. The
Court did, however, note that the facts in the case before it complied
with the qualifications in *Rochowiak.* 429 Mich 491.

evidence presented that would support an inference of a killing by negligent use of excessive force to perform the lawful act of defending against a forcible rape. Failure to instruct with regard to involuntary manslaughter precluded the jury from selecting a verdict consistent with an unintentional killing. Where the defendant's state of mind is at issue, mere shadings of meaning in the testimony and the instructions given to interpret the evidence may have great influence on individual jurors. Where, as here, there is no conflicting eyewitness testimony to rebut the defendant's claim that she merely used the force she felt was required to escape, the prejudice may be extreme. In *People v Lenkevich,* 394 Mich 117, 124; 229 NW2d 298 (1975), this Court stated:

> If in the presence of conflicting testimony the defendant had a right to rely on the defense of self-defense and its proper presentation to the jury, there is even more reason in the absence of conflicting testimony to afford the defendant such a right. A choice facing the jury in the absence of conflicting testimony is somewhat weighted and less flexible than one with conflicting testimony presenting in most cases a choice between two reasonable alternatives. If a defendant is prejudiced by erroneous instruction when a jury is faced with reasonable alternatives, he or she is certainly prejudiced by an erroneous instruction when a jury faces a weighted choice.

As the Court of Appeals below noted, if the jury in this case had been properly instructed, "the probability is high that at least one juror would have voted to convict on involuntary manslaughter, thereby making conviction of second-degree murder or voluntary manslaughter impossible."[10]

[10] *People v Landrum (On Remand),* 171 Mich App 148, 152; 429 NW2d 818 (1988).

The issue is not whether the jury was in the mood for leniency or whether the jury would have sought a compromise verdict, but, rather, whether an objective examination of the record reveals evidence of the unique elements of common-law involuntary manslaughter as distinguished from the elements of the other charged offenses, so that given the proper instructions, the jury might reasonably have convicted the defendant of the cognate offense to the exclusion of the primary offense or its necessarily included lesser offenses.

V

### DEADLY FORCE TO REPEL AN ATTEMPTED RAPE

The majority correctly acknowledges that the trial judge erred in not specifically instructing the jury that rape equates with serious bodily injury and that defendant had the right to use the force required to repel the attack. The majority nevertheless errs when it refuses to find that the error prevented the jury from fully understanding the applicable law. Given the erroneous instruction, the jury may have been confused regarding a woman's right to defend herself against sexual assault. The jury reasonably could have believed that defendant did not have the right to use deadly force, if necessary, to repel the sexual assault because, although in fear of sexual assault, she was not in fear of death or serious bodily harm.

Neither voir dire[11] nor closing arguments[12] were

---

[11] During voir dire defense counsel told the prospective jurors that rape or attempted rape can be an act of great bodily harm. The trial court specifically asked jurors if they had heard what defense counsel said and if they were willing to follow it if convinced of the facts supporting defendant's claim. Each of the jurors answered in the affirmative. Each also answered affirmatively when asked whether a prostitute has the right to protect herself against great bodily harm as a result of attempted rape.

[12] Defense counsel stated the following in closing argument:

Let's get to the meat of this thing, and I certainly don't

sufficient to obviate the need for a specific instruc-
tion from the judge on the right to use deadly
force to repel forcible rape. The trial judge never
clarified that defendant would have been justified
in using self-defense to prevent an attempted rape,
but could not have properly assaulted decedent
after intercourse for mere refusal to pay. This lack

intend to take a great deal of time in my talking with you.
There is no question but that Henry Green Thomas died and is
a probability that he, himself, fell in the tub and there is also
that reasonable possibility that the acts of Celestine Landrum,
what she did, may have caused or contributed to the death of
Henry Green Thomas. What she did, did she have a right to
do? *There again, I stated to you that defending herself against
a rape or an attempted rape is an absolute right and if she did
so in order to prevent that rape or in order to prevent great
bodily harm, the Court will instruct you that then she had a
right to do anything that she could do even to the point of
taking a life.* Mr. Ray is of the opinion that Mr. Thomas didn't
do anything really, didn't try and rape this young lady, but the
facts just don't warrant justifying his contention.

\*    \*    \*

[S]he kept trying to get her clothes and each time he would
try and get out of that bathtub and he already told her—and
excuse the language, ladies and gentlemen, but sometimes in
this case you must use the language that was used at that time,
and I wouldn't normally use it, of course, but he told her, "You
are going to fuck or fight." He told her, "Bitch, I am going to
kill you." He kept after her and she was merely trying to
prevent him from getting to her and she wanted to get her
clothes. She felt that if she could keep him in that bathtub that
she could go. Now, even if she were mistaken and if it appeared
to her that this is the thing that she had to do, then she is not
guilty and the Court will instruct you along those lines.

I submit to you that she wasn't mistaken. She finally did get
her clothes only when Henry Green Thomas said in so many
words, "I have had enough. I am going to sleep. I am giving up
this fight now. I can't take what I wanted from you so I am
going to sleep." That is when she got her clothes and to show
you, ladies and gentlemen, that these were the facts and this is
what she was doing, these were her intentions, she stood at
that bathroom door and she could hear him and she frantically
got on her clothes, and on several occasions he questioned her
and asked her if she were there. [Emphasis added.]

of clarification takes on added significance because
the prosecutor, in voir dire and in his closing
arguments, obscured the distinction between these
two situations.[13] Defense counsel attempted to
counter the prosecutor's tactics by telling the jury
in closing argument that the trial judge would
instruct them that defendant had the right to use
deadly force to repel the attack.[14] However, the
trial court's failure to corroborate that portion of
defense counsel's closing argument may have
made the entire argument suspect in the minds of
the jury. Further, it becomes apparent that on the
particular facts of this case, the lack of clarity in

[13] In the relevant portion of his closing argument the prosecutor
stated the following:

   The Judge will instruct you that at the time of the act *the
   Defendant must honestly believe that she is in danger of being
   killed or receiving serious bodily harm.* What did she say on
   cross-examination? "He told me to take my clothes off. Were
   you in fear for your life? No, told me to get into bed. Were you
   in fear for your life? No, told me he wasn't going to pay me.
   Were you in fear for your life? No. When you hit him with the
   phone were you in fear for your life? No." *For self-defense, at
   the time of the act the Defendant must honestly believe that
   she is in danger of being killed or receiving serious bodily
   harm.* The Defendant said she was not. The degree of danger
   must be serious bodily harm or death. The Defendant said that
   she did not have that fear and said she was not afraid. In fact,
   the Defendant said, "Up until the point at which I hit him with
   the phone, had he produced the money, we would have contin-
   ued with the sexual intercourse that the money was supposed
   to have been paid for." That is what she said on cross-examina-
   tion. She was not afraid. That fear wasn't necessary for there
   to be present a defense of self-defense.
   The Judge is going to give you that instruction. Listen to that
   carefully and see if it says she has to have had that requisite
   fear in order for there to be the defense of self-defense. Remem-
   ber her testimony. *The Judge will indicate that in order for
   self-defense to be present that fear must be present, and that in
   order for there to be a defense of self-defense, she must have it,
   and consider the testimony.* You will see she didn't have it, not
   fright. That is what she said. I wasn't afraid. If he would have
   produced the money, we would have continued the sex act.
   [Emphasis added.]

[14] See n 12.

the jury instructions severely prejudiced the defendant. Her primary line of defense, i.e., reasonable force to repel a forcible sexual assault, was not clearly presented to the jury. Also, the defendant's secondary line of defense, viz., negligent use of excessive force, was made less credible because it was not sufficiently emphasized that the defendant had the right to use the force necessary to repel the sexual assault. See *People v Rochowiak, supra,* 247-248.

### CONCLUSION

The majority errs in holding that none of the jury instruction errors and omissions complained of require a new trial for the defendant. Further, the accumulation of these errors resulted in a synergistic prejudicial effect upon the jury deliberations. Accordingly, we should affirm the Court of Appeals judgment reversing defendant Landrum's conviction and remanding for a new trial.

LEVIN, J. (*dissenting in Heflin*). We all agree that statutory involuntary manslaughter[1] is a cognate offense of murder. Ordinarily, when a defendant requests an instruction on a cognate offense the inquiry is whether the evidence justifies a conviction of the cognate offense.[2]

We dissent because we disagree with the resolu-

---

[1] Any person who shall wound, maim or injure any other person by the discharge of any firearm, pointed or aimed, intentionally but without malice, at any such person, shall, if death ensue from such wounding, maiming or injury, be deemed guilty of the crime of manslaughter. [MCL 750.329; MSA 28.561.]

[2] The majority states, however, that "even if we agreed with the defendant that he satisfied all the elements of statutory involuntary manslaughter, we disagree that the trial court erred in not instructing the jury on the offense." See *ante,* p 498.

tion of that inquiry in the majority opinion, and because we disagree with statements and suggestions in the majority and concurring opinions.

I

The majority appears to say that the trial court did not err in refusing to give the requested instruction on statutory involuntary manslaughter because there was no evidence to justify a conviction of that offense.[3]

The concurring opinion would hold that "accident" is a separate element of statutory involuntary manslaughter.[4] We acknowledge that the proposed construction of the statute is plausible. The proposed construction is not, however, the construction that this Court has, in recent cases, placed on the statute. This Court ruled in three cases, decided in 1974-1981, where there was no evidence of "accident," that the involuntary manslaughter statute was applicable.

A

In *People v Doss*, 406 Mich 90; 276 NW2d 9 (1979), the defendant, a police officer, was charged with statutory involuntary manslaughter after he shot and killed a suspect at the scene of a crime. There was no evidence that the shooting was an "accident."[5]

---

[3] See *ante*, p 504 ("a trial court need not instruct the jury on inconsistent theories when neither party produces a modicum of evidence in support of a particular theory"). See also *ante*, pp 500-504.

[4] The majority says that there was no evidence to justify a conviction of statutory involuntary manslaughter (see n 3), but does not explain wherein the evidence was insufficient. The concurring opinion says that there was no evidence of "accidental" discharge of a firearm. See *ante*, p 517.

[5] In this case, the evidence at preliminary examination *does not indicate the gun was accidentally fired. The evidence ap-*

Doss moved to quash the information after he was bound over for trial. The motion was denied. The Court of Appeals reversed. *People v Doss,* 78 Mich App 541; 260 NW2d 880 (1977). Relying on three early decisions of this Court,[6] the Court of Appeals concluded that the absence of malice was an element of statutory involuntary manslaughter. The Court of Appeals concluded that the prosecutor failed to prove that Doss had acted without malice and that it was therefore error to bind Doss over for trial.[7]

This Court reversed. A unanimous Court held that the absence of malice is not an element of statutory involuntary manslaughter and that a prosecutor is therefore not required to prove that the defendant acted without malice. *Doss, supra,* 406 Mich 98-99.[8] Since there was no evidence of

---

*pears to indicate defendant intended to fire the gun and that he hit what he aimed at. . . .* [T]he evidence shows that "the weapon was deliberately aimed at the complaining witness, and deliberately fired." At the moment defendant pulled the trigger, he intended "to cause the very harm" that resulted. *There is no evidence to support a finding that the death resulted from the careless use of firearms, that the shot was fired accidentally, or that defendant did not intend to harm the decedent.* [*People v Doss,* 78 Mich App 541, 553-554; 260 NW2d 880 (1977). Emphasis added.]

[6] *People v Chappell,* 27 Mich 486, 487-488 (1873), *People v McCully,* 107 Mich 343, 344; 65 NW 234 (1895), and *People v Peterson,* 166 Mich 10, 13; 131 NW 153 (1911).

[7] *Id.,* pp 549-554.

The Court of Appeals also held that the prosecutor failed to prove that the killing was not justified as a proper use of force in making an arrest. *Id.,* pp 554-559. The Court discussed, but did not decide, whether the prosecutor also failed to prove that the killing was not justified as a lawful use of force in self-defense. *Id.,* pp 559-560.

[8] This Court said of the decisions on which the Court of Appeals relied (see n 6):

While we are mindful of the line of cases beginning with *People v Chappell, supra,* supporting such a position [that absence of malice is an element of statutory involuntary manslaughter], we believe that the reasoning of those cases has

"accident"[9] in *Doss,* a construction that "accident" is an element of the statutory offense is inconsistent with the Court's decision that Doss was properly bound over on a charge of statutory involuntary manslaughter.[10]

In *People v Germain,* 91 Mich App 154; 284 NW2d 260 (1979), the defendant was convicted of first-degree murder in the shooting death of his girl friend. There was no evidence that the shooting was an "accident."[11] The trial court instructed the jury on first- and second-degree murder, but

been seriously undermined by this Court's decision in *People v Chamblis,* 395 Mich 408, 424; 236 NW2d 473 (1975) . . . . [*Id.,* p 98.]

This Court also held that the magistrate had not abused his discretion in finding that the killing was not justified as a matter of law. *Id.,* p 103. Cf. n 7.

[9] See n 5.

[10] The defendant in *People v Couch,* 176 Mich App 254; 439 NW2d 354 (1989), lv gtd 434 Mich 851 (1990), was also charged with statutory involuntary manslaughter although there was no evidence of "accident."

[11] At the preliminary examination, a police officer testified:

"He [Germain] continued to state that they [Germain and the decedent] had gone out that night and she had been giving him a hard time nagging. I believe he said the last six months, and upon returning home she continued to keep this nagging up, apparently at which he, if I remember correctly, the quote was he told her, '[s]hut your mouth bitch.' He stated he had slapped her on the side of the head, at which time he held his fist up. I presume showing what he used to do it with.

"At this point, Mr. Germain stated she continued to keep nagging at him, at which time he slapped her along the other side of the head and he said that he could tell that he had hit her pretty hard, I believe was his words, because her eyes were swelling up on both sides of her head.

"At this point, as I recall, Mr. Germain stated he said, '[o]kay, I'll show you,' and he said he went and got the shotgun. Prior to this he said he threw her on the bed. He didn't state which room this was, which bedroom this was, but he stated he had thrown her on the bed and then stated, 'I'll show you' and he said he went and got the shotgun and shot her." [*Id.,* pp 160-161.]

refused Germain's request to instruct on statutory involuntary manslaughter because "there was no testimony adduced from which an affirmative showing could be made of defendant's state of mind."[12]

Relying on this Court's decision in *Doss, supra,* the Court of Appeals held that the trial court erred in refusing to give the requested instruction because the only evidence necessary to support a conviction was that the defendant intentionally pointed a firearm at another person who died as a result of the subsequent discharge of the gun.[13] The Court of Appeals held, however, that the trial court's refusal to give the requested instruction was harmless error.[14]

This Court reversed the decision of the Court of Appeals on the ground that the trial court's refusal to give the requested instruction on statutory involuntary manslaughter was not harmless error. *People v Germain,* 411 Mich 858; 303 NW2d 740 (1981).[15] In holding that the refusal to give the requested instruction was not harmless error, this Court necessarily concluded that the evidence adduced at Germain's trial—which did not affirmatively show that the shooting was an "accident"—would have justified a conviction on the statutory

---

[12] *Id.,* p 158.

[13] *Germain, supra,* pp 158-159.

The Court of Appeals vacated Germain's conviction of first-degree murder because there was insufficient evidence of premeditation. *Id.,* pp 166-167.

[14] *Id.,* p 159.

[15] The Court's order read, in pertinent part:

[W]e reverse the Court of Appeals judgment because in the circumstances of this case the trial court's refusal to instruct the jury on manslaughter under MCL 750.329; MSA 28.561 was not harmless error. [*Id.*]

offense, and, implicitly, that "accident" is not an element of statutory involuntary manslaughter.

*People v Fountain,* 392 Mich 395; 221 NW2d 375 (1974), is the third case in which the involuntary manslaughter statute was held by this Court to be applicable although there was no evidence of "accident." Anderson, Carter, and Fountain were convicted of second-degree murder. Carter testified that he "grabbed a gun and fired into the air telling the group of people fighting him and his group to stop and go back. He said that when they kept coming he fired into the group in self-defense without intending to kill anyone."[16]

The Court of Appeals said that the evidence supported an instruction on statutory involuntary manslaughter.[17] The Court of Appeals said:

> If the jury had been instructed on [statutory involuntary] manslaughter, it could have found that the evidence did not prove self-defense but that it did prove the wounding of Charles Flagg from the discharge of a firearm pointed intentionally at him but without malice and that he died from the wounds. [*Id.,* p 499.][18]

---

[16] *People v Fountain,* 43 Mich App 489, 491; 204 NW2d 532 (1972).

It might be sought to distinguish *Fountain* on the ground that Heflin did not testify that he did not intend to kill Petersen. Such a distinction would ignore that the jurors could infer that Heflin did not intend to kill Petersen even though there was no affirmative testimony to that effect. See § I, part D.

[17] *Id.,* pp 498-499.

The Court of Appeals also said that the evidence supported giving instructions on assault with intent to do great bodily harm less than murder and on common-law manslaughter. *Id.,* p 499. The Court was uncertain whether the defendants had actually requested the instructions because the record did not contain defense counsels' written requests for instructions. *Id.,* p 498.

The Court addressed the instructional issue because it was reversing the defendants' convictions on other grounds, namely, the trial court's failure to provide the defendants an opportunity to be present when the court conducted an inquiry into jury tampering.

[18] See *ante,* p 503 ("a defendant who relies entirely upon the defense of self-defense cannot expect the trial judge to instruct the jury regarding statutory involuntary manslaughter").

This Court affirmed the decision of the Court of Appeals on the ground that the trial court's refusal to instruct on the lesser included offenses was error requiring reversal. *People v Fountain,* 392 Mich 401-402.[19] The Court held that the evidence—which did not show that the shooting was an "accident"—would have justified a conviction of manslaughter.

**B**

The import of this Court's decisions in *Doss, Germain,* and *Fountain* is that "accident" is not an element of statutory involuntary manslaughter. On the basis of those decisions, we would hold that the trial court erred in refusing to give the requested instruction.[20]

Because the jury rejected Heflin's claim of self-defense, there is no reason to believe that Heflin would have been acquitted altogether had the trial court instructed the jury on statutory involuntary manslaughter. We would remand the case to the circuit court for the entry of a judgment of conviction of statutory involuntary manslaughter and for resentencing.[21]

**C**

The majority asserts that it is not departing

[19] The Court disagreed with the Court of Appeals on the jury tampering issue (see n 17), but affirmed the reversal of the defendants' convictions on the basis of the instructional error.

The Court also found that the defendants had properly requested instructions on lesser included offenses. *Id.,* p 401. See n 17.

[20] We agree with the conclusion of the Court of Appeals that there was evidence that Heflin intentionally pointed a firearm at Petersen and that Petersen died as a result of the discharge of the firearm. See *People v Heflin,* unpublished opinion per curiam of the Court of Appeals, decided August 13, 1986 (Docket No. 85513), p 3. The majority appears to agree with this assessment of the record. See *ante,* p 499.

[21] With, of course, the option of retrial on a charge of second-degree murder.

from this Court's precedents.[22] However this Court's prior decisions are characterized,[23] it remains that the involuntary manslaughter statute was deemed applicable on evidentiary records that cannot be meaningfully distinguished from the record in the instant case.

A construction that "accident" is a separate element of statutory involuntary manslaughter is not supported by the text of the statute. Section 329 of the Penal Code provides:

> Any person who shall wound, maim or injure any other person by the discharge of any firearm, pointed or aimed, intentionally but without malice, at any such person, shall, if death ensue from such wounding, maiming or injury, be deemed guilty of the crime of manslaughter. [MCL 750.329; MSA 28.561.]

To the extent "accident" means "unintentional,"[24] the only element required to be an "accident" by the literal language of the statute is the killing. In terms, the statute does not limit its operation to cases where the discharge of the firearm is an "accident."[25] The statute refers to

[22] [W]e see no basis for the dissent's allegations that we have failed to "acknowledge" or "justify" a departure from prior decisions. Put simply, we have not previously decided the issue before us today, and there is no binding precedent from which we must acknowledge or justify a departure. [*Ante,* p 498, n 13.]

[23] See *ante,* p 496, n 10.

[24] According to one source, "accidental" means: "1. Occurring unexpectedly and unintentionally; by chance." *The American Heritage Dictionary, Second College Edition* (1982), p 72.

[25] Thus, the concurring opinion is incorrect as a matter of textual analysis when it says that "[a]*s defined in MCL 750.329; MSA 28.561,* statutory involuntary manslaughter is a very narrow criminal offense which is applicable only where it can be shown that the victim died as a result of a wound from a weapon intentionally aimed *but accidentally discharged.*" *Ante,* pp 516-517 (emphasis added).

"wounding, maiming or injury" caused by "the discharge of any firearm," not "the *accidental* discharge of any firearm."[26]

The statute provides that the proscribed act (the intentional pointing or aiming of a firearm at another person) must have been done "without malice." In the law of homicide, the intention to kill—actual or implied—is called "malice." The literal language of the statute thus requires that the killing be "unintentional" or, in that sense only, "accidental."

### D

The majority appears to say that the trial court did not err in refusing to give the requested instruction on statutory involuntary manslaughter because there was no evidence to justify a conviction of that offense.[27] To the extent the majority would hold that "affirmative" evidence is necessary to justify a finding that a defendant who committed a homicide acted without malice,[28] it is clearly mistaken.

---

[26] Compare MCL 752.861; MSA 28.436(21):

> Any person who, because of carelessness, recklessness or negligence, but not wilfully or wantonly, shall cause or allow any firearm under his immediate control, to be discharged so as to kill or injure another person, shall be guilty of a misdemeanor . . . .

[27] See n 3.

[28] If the basis of the holding that the evidence did not justify a conviction of the lesser offense is that there was no evidence of absence of malice, then *Doss* would in effect be overruled because in *Doss* the Court held that the absence of malice was not an element of statutory involuntary manslaughter. See n 8 and the accompanying text. Surely the majority would not adopt a double standard under which the defendant, when he seeks an instruction on a lesser offense, is required to offer some evidence respecting an "element" that the prosecutor would not be required to prove had the lesser offense been the charged offense.

The fact of homicide gives rise to a permissible inference—not a mandatory presumption—of malice[29] without regard to whether, as in the case of statutory involuntary manslaughter, the homicide was committed with a deadly weapon.[30]

In the instant case, it was undisputed that Heflin killed Petersen. As is typical in homicide cases, there was no direct evidence that Heflin acted with the intention to kill. Malice could only be found by drawing inferences from the circumstances of the killing.

The prosecutor urged the jurors to infer that Heflin had acted with malice. The jurors were not, however, required to adopt the prosecutor's view of the evidence. Because malice is a permissible inference and not a mandatory presumption, the jurors, accepting the evidence that Heflin killed

[29] See *Maher v People,* 10 Mich 212, 218 (1862), and *People v Scott,* 6 Mich 287, 296 (1859). See also *People v Stinson,* 58 Mich App 243, 248; 227 NW2d 303 (1975), and *People v Morrin,* 31 Mich App 301, 317-319; 187 NW2d 434 (1971).

[30] *People v Martin,* 392 Mich 553, 561; 221 NW2d 336 (1974) ("The law does not imply malice where a deadly weapon is used. Michigan has long ago considered malice a permissible inference to be drawn by the jury rather than a presumption of law"). See also *People v Jacobson,* 400 Mich 859; 282 NW2d 922 (1977), rev'g *People v Jacobson,* 72 Mich App 489; 250 NW2d 105 (1976).

In *People v Richardson,* 409 Mich 126, 143-144; 293 NW2d 332 (1980), the Court explained:

The portion of the instruction which stated that *the law implies malice* "from the unprovoked, unjustifiable, or inexcusable killing" or when "a man kills another suddenly and without provocation" had the effect of withdrawing from the jury the essential factual issue of the existence of malice. The law, of course, does not imply malice from a sudden and unprovoked killing, and it was error to so instruct. The necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing, but it can never be *established as a matter of law* by proof of other facts. [Emphasis in original.]

See also *People v Hawley,* 417 Mich 975; 332 NW2d 398 (1983), rev'g *People v Hawley,* 112 Mich App 784, 787-788; 317 NW2d 564 (1982).

Petersen, need not have been persuaded beyond a reasonable doubt that the evidence supported the inference that Heflin had killed with malice.[31]

If, consistent with this Court's precedents, "accident" is not held to be a separate element of statutory involuntary manslaughter, Heflin was entitled to the requested instruction because the jury could have inferred from the evidence that he acted without malice. To the extent the majority would hold otherwise, it in effect adopts the presumption that a person who commits a homicide acted with malice—a presumption that stands in direct conflict with this Court's precedents.[32] It may be, or may seem to be, natural to infer that a defendant acted with malice when the record does not contain affirmative evidence of "accident." It is not proper, however, for the trial court—or a reviewing court—to draw that inference. Fact finding is for the jury.[33]

Illustrative is a line of older cases addressing the question whether a trial court may direct a verdict

[31] For this reason, the concerns expressed by the majority (see *ante,* p 504) that "the jury conceivably could convict a defendant of a lesser crime upon the basis of factors inconsistent with and wholly unrelated to the evidence introduced at trial," are inapposite.

[32] See ns 29-30 and the accompanying text.

[33] See *Maher,* n 29 *supra,* p 218:

> It is for the court to define the legal import of the term, malice aforethought, or, in other words, that state or disposition of mind which constitutes it; but the question whether it existed or not, *in the particular instance,* would, upon principle, seem to be as clearly a question of fact for the jury as any other fact in the cause, and that they must give such weight to the various facts and circumstances accompanying the act, or in any way bearing upon the question, as in their judgment, they deserve: and that the court have no right to withdraw the question from the jury by assuming to draw the proper inferences from the whole, or any part of, the facts proved, as presumption of law. If courts could do this, juries might be required to find the fact of malice where they were satisfied from the whole evidence it did not exist. [Emphasis in original.]

of guilty in a criminal case.[34] In *People v Heikkala,*
226 Mich 332, 337; 197 NW 366 (1924), this Court
said:

> A trial judge, having properly applied the law to
> the facts in a criminal case *in which intent is not
> involved,* and where the facts are undisputed, may
> say to the jury that it is their duty to bring in a
> verdict of guilty, but he may not go further and
> peremptorily direct or compel such verdict.[35] [Emphasis added.]

Thus, even when the prosecution's evidence is
uncontroverted, the defendant's state of mind is
always a question of fact for the jury.

## II

As an alternate basis for reversing Heflin's conviction of second-degree murder, we would hold
that the trial court erred in refusing to give the
instruction requested by Heflin on common-law
involuntary manslaughter.[36]

For the reasons stated in our opinion in the
companion case of *People v Landrum, post,* pp 573-
579, a request to instruct on common-law involuntary manslaughter could not properly be denied
simply because the defendant asserted self-defense
or because the killing may have occurred during
the commission of an unlawful act.[37]

The evidence in the instant case justified a

[34] The cases are collected and discussed in *People v Deneweth,* 14
Mich App 604, 610-617; 165 NW2d 910 (1968) (concurring opinion).

[35] See also *People v Howard,* 179 Mich 478, 489-490; 146 NW 315
(1941), *People v Warren,* 122 Mich 504, 517-518; 81 NW 360 (1899),
and *People v Neumann,* 85 Mich 98, 104; 48 NW 290 (1891).

[36] The Court of Appeals affirmed the trial court's refusal to give the
requested instruction. See *Heflin,* n 20 *supra,* p i, n 2.

[37] Heflin sought to make the same argument to the jury that the
defendant in *People v Landrum, post,* advances in this Court (i.e.,
gross negligence in the use of force in self-defense). Although Heflin

conviction of common-law involuntary manslaughter. The question whether Heflin

> —acted with the mens rea for murder: the intention to kill, the intention to cause serious bodily harm, or the intention to create a very high risk of death or serious bodily harm with the knowledge that death or serious bodily harm would be a probable result of his conduct,[38] or
> —acted with the mens rea for involuntary manslaughter: the failure to exercise ordinary care to prevent a threatened harm to another person where it was apparent to the ordinary mind that the likely result of the failure to use such care would be serious harm to that person,[39]

was a question for the jury.

There was evidence from which the jury could have inferred that Heflin acted with malice. There was also, however, evidence from which the jury could have inferred that Heflin acted in a grossly negligent manner. Heflin may indeed have created a very high risk of death or serious bodily harm when he fired a shotgun at Petersen. That does not necessarily—as a matter of law—mean, however, that he intended to create that risk or that he intended the risk to materialize. The jury could have found that Heflin did not act with malice, but

was denied leave to cross appeal, cross appeal is not required unless the appellee seeks relief not granted by the Court of Appeals; Heflin properly seeks affirmance of the decision of the Court of Appeals remanding the case for a new trial on the basis that the Court of Appeals and the trial court erred in concluding that a requested instruction on common-law involuntary manslaughter was not required.

[38] See CJI 16:2:02 (murder where first-degree felony-murder is the charged offense), and 16:3:01 (second-degree murder).

[39] See CJI 16:4:05 (gross negligence).

that he was guilty of gross negligence because he failed to exercise care in using the shotgun to defend himself and it was apparent to the ordinary mind that his failure to use such care would result in serious harm to Petersen.

This homicide arose out of a highly emotional domestic dispute. According to all the evidence, the killing occurred shortly after a heated argument between Heflin and his daughter concerning physical abuse of Heflin's granddaughter. According to Heflin, immediately before the shooting Petersen admitted that he had beaten Heflin's granddaughter and taunted him about his inability to prevent such abuse. The jury could have inferred that due to the excitement of the situation Heflin had not formed the requisite intent for murder when he shot Petersen.[40]

The trial court's error cannot be characterized as "harmless" on the basis that the jury was given the opportunity to convict Heflin of voluntary manslaughter and failed to do so. The rejection of voluntary manslaughter does not necessarily imply that the jurors concluded that Heflin was not in an excited state of mind ("heat of passion") when he killed Petersen. The jurors may have rejected voluntary manslaughter because they concluded there was not adequate provocation, an element of *voluntary* manslaughter.

III

The majority offers two rationales for reversing the decision of the Court of Appeals in addition to its conclusion that there was not sufficient evi-

[40] In concluding that the evidence was sufficient to justify a conviction of involuntary manslaughter, we express no opinion on the doctrine of "imperfect self-defense." In the companion case of *People v Landrum, post,* p 582, the Court expressly decided not to consider the doctrine of "imperfect self-defense." 431 Mich 906 (1988).

dence to justify a conviction of statutory involuntary manslaughter.

### A

The majority asserts that Heflin "conceded" that he acted with malice when he killed Petersen and that as a result the trial court was not required to give the requested instruction on statutory involuntary manslaughter.[41] If Heflin had in fact conceded—which he did not—that he intentionally killed Petersen, there might be some merit in the majority view.

The majority does not identify a basis for its assertion that Heflin so "conceded." The record does not contain a stipulation that Heflin acted with malice. Nor did Heflin testify that he intentionally killed Petersen.[42] There was no direct evidence that Heflin acted with malice.

The assertion that Heflin made such a "concession" ignores the presumption of innocence. Even when a defendant offers no evidence, the prosecutor is required to prove beyond a reasonable

---

[41] In our opinion, a significant difference exists between requiring the plaintiff to prove a negative element [the absence of malice] and a situation in which the defendant concedes that he intentionally killed the victim, but argues that he had a legal justification for doing so. In the instant case, defendant could have required the prosecutor to prove that the defendant had the requisite mens rea for murder either by not conceding as much or arguing in the alternative. He chose not to do so. Rather, he chose to concede an element in order to proceed with his sole ground for defense. [*Ante,* p 499.]

[42] Heflin testified that he shot Petersen because he was afraid:

*Q.* Why don't you tell us which reason you had for shooting him. Was it because you were scared or because you were upset?

*A.* Because I was afraid of what he was going to do to my family, because I was scared.

doubt each element of the charged offense.[43] The prosecutor's evidence—even when "overwhelming" or otherwise uncontradicted—is always balanced against the presumption of innocence.[44]

The alleged "concession" appears to be partially based on the failure of Heflin's lawyer to argue to the jury that it should consider convicting Heflin of statutory involuntary manslaughter.[45] Before the trial court instructed the jury, Heflin's lawyer said that he wished to argue that Heflin unintentionally killed Petersen and that the jury should consider convicting Heflin of involuntary manslaughter. The trial court, however, refused to instruct on either statutory or common-law involuntary manslaughter. Heflin and his lawyer should not be faulted for failing to argue to the jury an offense on which the jury was not going to be instructed.

The "concession" may also have been predicated in part on the failure of Heflin's lawyer to expressly argue to the jury that Heflin "accidentally or unintentionally killed Rich Petersen," and that he was therefore not guilty of murder.[46] It is again relevant that the trial court refused to instruct on either statutory or common-law involuntary manslaughter. In seeking instructions on those offenses, Heflin indicated that he did not necessarily contend that he should be acquitted altogether because he did not intend to kill Petersen. Heflin

[43] The majority opinion is incorrect when it suggests that in the instant case the prosecutor did not have the burden of proving that Heflin acted with malice. See *ante,* p 499 (quoted in n 41).

[44] See also n 35 and the accompanying text.

[45] See *ante,* p 503 ("a defendant who relies entirely upon the defense of self-defense cannot expect the trial judge to instruct the jury regarding statutory involuntary manslaughter, a crime neither supported by the evidence *nor presented to the jury by the defendant or the prosecutor*") (emphasis added).

[46] *Ante,* p 502. See also *ante,* p 499 (quoted in n 41).

should not be penalized by invocation of a doctrine of "constructive concession."[47]

Any attempt to base a "concession" that Heflin acted with malice on the argument and theories of Heflin's lawyer also runs afoul of the long-established rule in Michigan that the element of intent in a criminal case may not be supplied by the admissions of the defendant's lawyer.[48]

B

The majority would also affirm the trial court's refusal to give the requested instruction on the basis that the assertion of self-defense is "inconsistent" with a request to instruct the jury on statutory involuntary manslaughter.[49] The majority does not explain, except in conclusory terms, why statutory involuntary manslaughter and self-defense are "inconsistent."

The majority appears to assert that self-defense is "inconsistent" with statutory involuntary manslaughter because self-defense necessarily implies an intentional killing. The majority says that "[a] finding that a defendant acted in justifiable self-

[47] See, generally, *People v Chamblis,* 395 Mich 408, 426; 236 NW2d 473 (1975), where the Court said:

If the evidence shows that the defendant committed a crime of lesser degree than that with which he was charged, he should be found guilty of *that* offense. He should not escape punishment for lack of evidence of an element not required to convict of the lesser offense. Nor should he be convicted of a higher offense because the jury recognizes that he did commit some offense. Society has a legitimate interest in the jury's freedom to act according to the evidence. [Emphasis in original.]

[48] See *People v Hall,* 86 Mich 132, 133; 48 NW 869 (1891) ("A conviction in a criminal case, involving the question of intent, cannot be predicated upon the admissions of counsel"). See also *Julian v United States,* 236 F2d 155, 158 (CA 6, 1956).

[49] See *ante,* pp 498 and 500-502.

defense necessarily requires a finding that the defendant acted intentionally, but that the circumstances justified his actions."[50]

The statement in the majority opinion is correct. Self-defense does involve some intentional act in response to a perceived threat. The analysis in the opinion is flawed in its attempt to equate an intentional *act* with intentional *killing.* The distinction between the intentional perpetration of an act and an unintended result of the act is of paramount importance in the law of homicide.[51] If a person was deemed to have intentionally killed whenever death results from the intentional perpetration of an act, involuntary manslaughter could be charged only in bizarre circumstances difficult to hypothesize.

The distinction—recognized in other contexts—between an intentional act and an unintentioned result is also applicable in the context of self-defense. A person who kills in self-defense may not have intended to cause any injury to his assailant; he may have intended merely to frighten him. Or a person who kills in self-defense may have intended to cause his assailant only slight bodily harm.[52] In terms of statutory involuntary manslaughter, a person who intentionally pointed or aimed a firearm at another person may not have intended to discharge the weapon, or may have intended to discharge the weapon but not to injure the decedent.

The essence of self-defense is the defendant's

---

[50] *Ante,* p 503.

[51] The distinction between an intentional act and an unintentional result is the basis of the involuntary manslaughter statute, which proscribes the intentional pointing or aiming a firearm when done without the intention to kill.

[52] And, of course, a person who kills in self-defense *may* have intended to kill his assailant or otherwise *may* have acted with malice.

belief that he is confronted with imminent death or serious bodily harm. In *Doss*[53] and *Fountain*,[54] the defendants asserted self-defense, and that assertion was apparently not thought to be "inconsistent" with statutory involuntary manslaughter. If a defendant believes he is confronted with imminent death or serious bodily harm, self-defense may be interposed as a defense whether he intentionally or unintentionally killed the assailant. Until this Court rules that self-defense may not be interposed when the charge is involuntary manslaughter, the majority errs in assuming, as a basis of decision in the instant case, that a person who asserts that he killed in self-defense acted with malice.

Homicide, the killing of one person by another, may be innocent or criminal. If criminal, it may be murder or manslaughter. A defendant who claims self-defense is asserting that the homicide was innocent. An assertion of self-defense may—in some circumstances—include an admission that the defendant committed the homicide. It does not, however, necessarily include an admission that in committing the homicide, the defendant acted with malice—the requisite mental state for murder.

By asserting self-defense and requesting an instruction on manslaughter, Heflin was in effect saying: "I did not commit any crime because I acted with lawful justification—in self-defense. If the jury finds that I did not act in self-defense and that I am guilty of a crime, I am guilty of manslaughter and not murder because I did not intend to kill." Heflin's alternative defenses were not "inconsistent."

A defendant in a criminal case is entitled to a

---

[53] See n 7.

[54] See the text accompanying n 18.

general verdict on the merits.[55] The right to the
return of a general verdict is one of the substan-
tial elements of the constitutional right of trial by
jury.[56] Even when a defendant asserts an affirma-
tive defense, the ultimate issue at trial—and the
question the jury must be permitted to answer by
general verdict—is whether the defendant is guilty
or innocent of the crime charged. A trial court
may not limit the jury to a special verdict on the
basis of the defendant's asserted defense.[57] That is
the law even when the defendant does not deny
that he committed acts comprising the charged
offense.[58]

If a defendant, who is charged with murder,
asserts self-defense, the trial court could not—con-
sistent with the defendant's constitutional right to
a general verdict—limit the jury's choices to guilty
of murder or "not guilty by reason of self-defense."
This Court would in effect so limit the possible
verdicts if its decision today means that a defen-
dant who asserts self-defense admits that he killed
the decedent and that he did so intentionally.

Absent direct evidence, the question whether a
person who killed in self-defense acted with malice

[55] See *People v Woody,* 380 Mich 332, 337-338; 157 NW2d 201
(1968), *People v Clark,* 295 Mich 704, 707; 295 NW 370 (1940), and
*People v Marion,* 29 Mich 31, 40-41 (1874).

[56] See *Clark,* n 55 *supra,* p 707.

[57] See *Woody,* n 55 *supra,* p 337 (the defendant asserted that he was
not guilty by reason of insanity). Accord *People v Way,* 22 Mich App
473, 476-478; 177 NW2d 729 (1970), and *Deneweth,* n 34 *supra,* p 606.
See also *People v Young,* 20 Mich App 211, 215-216; 173 NW2d 793
(1969). Cf. *City of East Lansing v Deutsch,* 19 Mich App 74, 86-90; 172
NW2d 392 (1969) (the trial court was not permitted to direct a guilty
verdict where the defendant did not deny violating a municipal
ordinance, but instead claimed unsuccessfully that the ordinance was
unconstitutional).

[58] By pleading not guilty, a defendant puts in issue every element of
the prosecution's case. With the exception of ultimate facts which the
defendant himself admits at trial, the prosecution's evidence must be
weighed against the presumption of innocence even when the prosecu-
tion's evidence is "overwhelming" or otherwise uncontradicted.

can only be resolved by drawing inferences from the circumstances of each particular case. Drawing inferences is the province of the jury. The malice question should not be resolved by the court by adoption of a fictional presumption that would be applicable where the evidence of absence of malice is deemed by the court to be "more persuasive."

In the final analysis, the statement in the majority opinion that the assertion of self-defense is "inconsistent" with statutory involuntary manslaughter reflects an assessment by the majority that the evidence shows that Heflin intended to kill Petersen. That assessment invades the province of the jury.

The question was not whether the evidence was sufficient to support a jury finding that Heflin acted with malice, but whether the evidence would have justified a finding that Heflin acted without malice and was therefore guilty of involuntary manslaughter.

We would remand the case to the circuit court for the entry of a judgment of conviction of statutory involuntary manslaughter and for resentencing.[59]

CAVANAGH, J., concurred with LEVIN, J.

LEVIN, J. (*dissenting in Landrum*). We agree with the result and much of the reasoning set forth in Justice ARCHER's dissenting opinion. We write separately to address the following:

1) A woman's right to use force—deadly force *if necessary*—to prevent a sexual assault.

2) The adequacy of the trial court's instructions regarding Landrum's claim of self-defense.

3) Gross-negligence involuntary manslaughter

[59] See n 21 and accompanying text.

as it relates to the excessive use of force in self-defense, and "unlawful-act" involuntary manslaughter in general.

4) The "objective" theory of self-defense—an issue not raised in the instant cases yet discussed in the lead opinion.

I

The lead opinion would hold that a woman[1] is permitted to use deadly force to prevent a sexual assault only when she has an honest and reasonable belief that she is in danger of imminent death or serious bodily harm.[2] The opinion would thus apply general principles of the law of self-defense —which permit a person to use deadly force only to prevent death or serious bodily harm—to the situation where a woman is confronted with a possible sexual assault.[3] In determining whether a

[1] Because the defendant in the instant case is female, our discussion refers to a woman's right to use force to prevent a sexual assault. The same principles would apply to all cases of sexual assault regardless of the sex of the victim or the assailant.

[2]   [W]e would hold that a person may use deadly force in self-defense to repel a criminal sexual assault *when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm. [Ante, p 512. Emphasis added.]*

Although the passage refers to a *"reasonable* belief," the lead opinion elsewhere "holds" that an *"honest and reasonable belief"* is required to sustain a claim of self-defense. See *ante,* pp 502, 503, n 16, 508, 510, n 23, and 512. Presumably, no difference in meaning is intended.

[3] The lead opinion claims that its holding, and a corresponding jury instruction, "addresses the delicate balance between the well-established doctrine of self-defense on the one hand, and the extremely egregious and personally intrusive crime of criminal sexual conduct on the other." *Ante,* p 512.

The opinion does not strike a balance. A woman who has an honest and reasonable belief that she is in danger of imminent death or serious bodily harm would always be entitled to use force—deadly force *if necessary*—whether the threat to her well-being occurred in the form of a sexual assault or a nonsexual assault.

woman is threatened with "death or serious bodily harm," the opinion focuses on the means by which the assailant attempts to accomplish his criminal object.[4]

The lead opinion does not consider the unique characteristics of a sexual assault that justify a woman's use of force—deadly force *if necessary*—whether or not she believes that she is in danger of imminent death or *other* serious bodily harm.

A

Instead of focusing on whether the assailant presents a threat of imminent death or serious bodily harm in furtherance of the sexual assault, we would focus on whether the woman consented to the sexual activity with which she was confronted. Nonconsensual intercourse—whether or not it is accompanied by a belief that one is in danger of imminent death or *other* serious bodily harm—is an attack on a woman's autonomy and bodily integrity.

A woman's right to determine who will have access to her body—and under what conditions—is a fundamental component of her individual autonomy. The quality of a woman's autonomy suffers when she is subjected to a physical assault. When the assault is a sexual assault, the damage to a woman's autonomy is even more severe.

Sex is a personal matter which often is a medium for the expression of fundamental human emotions. A woman's ability to express basic human emotions may suffer when another person gains sexual access to her body without her consent.

Nonconsensual intercourse is a profoundly

[4] See *ante,* p 512 (quoted in n 2).

harmful experience whether or not a woman be-
lieves she is in danger of imminent death or *other*
serious bodily harm. Nonconsensual intercourse—
*in itself*—is a form of "serious bodily harm" in-
cluded within the common-law definition of the
threatened injuries that justify the use of deadly
force.[5] It is a bodily invasion immeasurably more
severe than a nonconsensual injection with a hypo-
dermic needle. It may often cause other significant
physical, emotional, and psychological injuries.

We would hold that a woman is entitled to use
force—deadly force *if necessary*—to prevent any
nonconsensual intercourse. It is enough that the
woman—for whatever reason—does not consent to
have sex with the assailant.[6]

B

The lead opinion cites § 520b(1)(f)(iii) of the Pe-
nal Code, which proscribes as first-degree criminal
sexual conduct sexual penetration accomplished by
a threat of *future* retaliation,[7] in arguing against

[5] We thus would not adopt a "different and special rule." Cf. *ante,* p
511, n 26.

The lead opinion adopts a "different and special rule" under which
nonconsensual intercourse is the one form of serious bodily harm
against which a person may not use deadly force *when necessary.*

[6] Justice COOLEY observed:

The outrage upon the woman, and the injury to society, is
just as great in these cases as if actual force had been em-
ployed; and we have been unable to satisfy ourselves that the
act can be said to be any less against the will of the woman
when her consent is obtained by fraud, than when it is extorted
by threats or force. [*People v Crosswell,* 13 Mich 427, 438
(1865).]

[7] (1) A person is guilty of criminal sexual conduct in the first
degree if he or she engages in sexual penetration with another
person and if any of the following circumstances exists:

* * *

(f) The actor causes personal injury to the victim and force or

the adoption of a blanket rule that would require a trial court to instruct the jury that a woman is entitled to use force to prevent any "forcible" rape.[8] The opinion explains that "[u]nlike common-law rape, under these statutory provisions, forcible criminal sexual conduct may arise from circumstances in which the victim never had an honest and reasonable belief that his life is in imminent danger or threat of serious bodily harm."[9] On the basis that the woman in such a case would fear future—as opposed to imminent—death or serious bodily harm, it is said that she would not be justified in using deadly force to prevent this form of sexual assault.

The analysis in the lead opinion ignores that nonconsensual intercourse—*in itself*—is a form of "serious bodily harm" that justifies the use of deadly force. Whether an assailant says "Submit or I will kill you now," or "Submit or I will kill you next week," a woman is confronted with the threat of imminent nonconsensual intercourse. It is the possibility of imminent infliction of that harm—not the possibility of imminent or future infliction of some other "serious bodily harm"— that entitles a woman to use force to prevent the sexual assault.[10]

---

coercion is used to accomplish sexual penetration. Force or coercion includes but is not limited to any of the following circumstances:

\* \* \*

(iii) When the actor coerces the victim to submit by threatening to retaliate in the future against the victim, or any other person, and the victim believes that the actor has the ability to execute this threat. As used in this subdivision, "to retaliate" includes threats of physical punishment, kidnapping, or extortion. [MCL 750.520b(1)(f)(iii); MSA 28.788(2)(1)(f)(iii).]

[8] See *ante,* p 512.

[9] *Ante,* p 512.

[10] We agree with the statement in the lead opinion that when one

The lead opinion says that a woman is entitled to use deadly force to prevent "common-law rape."[11] At common law, "rape" was sexual intercourse accompanied by a significant physical struggle between the assailant and the victim.[12] The present statutory scheme, however, proscribes as first-degree criminal sexual conduct nonconsensual intercourse that might not have constituted rape at common law.[13]

The lead opinion regards the difference between common-law rape and statutory criminal sexual conduct as a reason why trial courts should not be required to instruct on self-defense whenever a woman is confronted with a potential "rape."[14] The difference, however, reflects a legislative judgment —a judgment that should inform this Court's decision—that nonconsensual intercourse may constitute a serious bodily harm whether or not broken bones and bruises are also threatened or actually occur. There is no basis in logic or legislation for the adoption of a doctrine of "rape plus," under which the threat of imminent nonconsensual inter-

person acts in defense of another, he "steps into the shoes" of the threatened individual. See *ante,* p 511, n 26. In our opinion, a third person *would* be entitled to use force—deadly force *if necessary*—to prevent nonconsensual intercourse under the circumstances specified in § 520b(1)(f)(iii).

[11] See *ante,* p 511.

[12] The opinion does not explain what it means by "common-law rape."

It is often said that rape at common law was the unlawful carnal knowledge of a woman by force and without her consent. See Clark & Marshall, Crimes (7th ed), § 11.01, p 752. If a woman "consciously consent[ed] to the act of intercourse, however tardily or reluctantly, and however persistently she may [have] resist[ed] for a time," the act was not rape. *Id.,* p 754. In 1864, the Court said that "[t]he general rule requires, not only that there should be force, but that the utmost reluctance and resistance on the part of the woman, should appear . . . ." *Crosswell,* n 6 *supra,* p 433. Resistance, as distinguished from nonconsent, is not an element of the statutory offense of criminal sexual conduct. MCL 750.520i; MSA 28.788(9).

[13] See, e.g., § 520b(1)(f)(iii).

[14] See *ante,* pp 510-513.

course is insufficient to justify the use of force—deadly force *if necessary*—unless there is also a threat of imminent *other* "serious bodily harm."

If the Court were to rule that nonconsensual intercourse is not in itself "serious bodily harm," then a woman who is told "Submit, and I won't hurt you," might not be justified in using significant force to prevent the unwanted sexual advance. There would be no need to resist to avoid "physical injury." The only purpose of resistance would be to avoid being "raped." Resistance might result in an escalation of a confrontation which theretofore had not posed a threat of "physical injury." It might be urged that the woman should be seen as the initial aggressor,[15] and that she could not regain the right of self-defense unless she withdrew and clearly communicated her intention to do so. And that was, indeed, the prosecutor's theory and argument in this case.

C

The lead opinion would hold that "a trial court should instruct the jury that a person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm."[16] The opinion would not require a trial court to expressly instruct the jury that a woman may use deadly force to prevent a particular form of threatened sexual assault or that threatened sexual assault constitutes "serious bodily harm" as a matter of law.

[15] In the instant case, Landrum testified that she used nondeadly, albeit significant, force when she first attempted to resist the assailant's sexual assault, and that it was not until the assailant responded with significant force that Landrum used additional force.

[16] *Ante,* pp 512-513.

The opinion would require that a person's belief be honest in addition to reasonable. See n 2.

We all would agree that a sexual assault causes extremely serious harm—harm that cannot be adequately measured in terms of broken bones and bruises. We also would all agree that under certain circumstances a woman is entitled to use force—deadly force *if necessary*—to prevent a threatened sexual assault. We disagree how to clearly inform the jury that a woman is entitled to use such force.[17]

A court does not adequately inform the jury that a woman is entitled to use deadly force to prevent a threatened sexual assault when it instructs the jury that a woman is entitled to use deadly force to prevent "serious bodily harm." The common-law formulation is inadequate—not because sexual assault is not a "serious harm"—but because in some situations a significant portion of the harm caused by a sexual assault might not be characterized by the jury as "bodily harm."

In common parlance, "bodily harm" refers to physical—not psychological or emotional—injury.[18] In many cases, however, the violation of a woman's bodily autonomy and the accompanying psychological and emotional trauma may be the most severe and long-lasting injury. As trial courts customarily instruct the jury, a woman's fear of those harms does not support her claim of self-defense.

This Court has the luxury of interpreting common-law formulations to reach a correct result. The Court can say that a tomato is a vegetable even though it is a fruit. A jury, however, is instructed that it has a duty to apply the law as explained by the court. If a court instructs the jury that a woman is entitled to use deadly force

[17] We also disagree more fundamentally. See § I, parts A and B.

[18] According to one source, "bodily" means "Physical as opposed to mental or spiritual: *bodily welfare.*" *The American Heritage Dictionary, Second College Edition* (1982), p 193 (emphasis in original).

to prevent "serious bodily harm" and the jury
finds that the woman used deadly force to prevent
serious nonbodily harm, the jury is obligated to
reject the woman's claim of self-defense. Although
the jury has the power to disregard the court's
instructions on the law, this Court does not ordi-
narily assume that the jury will do so.

In many cases, a jury will conclude—despite a
needlessly opaque instruction—that a threatened
sexual assault was "serious bodily harm" and that
the woman was entitled to use deadly force to
prevent the assault. In other cases, however, a
jury might not conclude that a particular form of
threatened sexual assault is "serious bodily harm."

Where, for example, a woman used deadly force
to prevent "sexual penetration"[19] other than inter-
course, a jury might conclude—absent evidence
that the assailant used significant bodily force—
that the woman did not act on the basis of a belief
that she was in danger of imminent death or
serious bodily harm. Although a jury might regard
nonconsensual intercourse as "serious bodily
harm" per se,[20] this cannot be said—with any
degree of certainty—with respect to fellatio and
cunnilingus. Yet, a woman who is confronted with
nonconsensual fellatio or cunnilingus ·may be
threatened with much the same harm from the
violation of her bodily autonomy as a woman who

---

[19] "Sexual penetration" means sexual intercourse, cunnilingus,
fellatio, anal intercourse, or any other intrusion, however
slight, of any part of a person's body or of any object into the
genital or anal openings of another person's body, but emission
of semen is not required. [MCL 750.520a(1); MSA 28.788(1)(1).]

[20] For reasons which are discussed in § II, when the defendant is a
prostitute a jury might not conclude that nonconsensual intercourse
is "serious bodily harm." Similar concerns also might be present
when there is a prior history of sexual relations between the woman
and the assailant. See 1988 PA 138, amending MCL 750.520l; MSA
28.788(12) (abolishing spousal immunity in prosecutions for criminal
sexual conduct).

is confronted with nonconsensual intercourse. In the Legislature's judgment, unlawful fellatio and cunnilingus are offenses of the same magnitude as unlawful sexual intercourse.[21]

In most contexts, the common-law formulation of "death or serious bodily harm" adequately describes the range of threatened conduct that justifies one person taking the life of another. The common-law formulation is not adequate in the context of sexual assault.

II

If one believes that $30 is all that is at stake in the instant case, the instructions on self-defense were adequate.

This case involves something more than $30—it concerns a woman's right to control with whom she has sex, and under what conditions. The instructions in the instant case did not inform the jury that Landrum was entitled to use force—deadly force *if necessary*—to prevent Thomas from having intercourse with her even if her only reason for not consenting was Thomas' unwillingness to pay $30. The instructions did not adequately present Landrum's theory of self-defense.

A

The success of Landrum's claim of self-defense hinged on the manner in which the jury evaluated her testimony regarding the commencement of the physical struggle that culminated in Thomas' death. The court instructed the jury that if Landrum was the initial aggressor, she did not have

---

[21] For the definition of the degrees of "criminal sexual conduct" involving "sexual penetration" and the corresponding punishment, see MCL 750.520b, 750.520d; MSA 28.788(2), 28.788(4). For the definition of "sexual penetration," see n 19.

the right to use force in self-defense unless she
withdrew from the fight and clearly informed
Thomas of her desire for peace.[22] Since Landrum's
testimony—the only evidence on the matter—indi-
cates there was one continuous struggle beginning
in the bedroom and ending in the bathroom,[23] if
the jury found that Landrum was the initial. ag-
gressor her claim of self-defense would be defeated.

The first incident of significant violence between
Landrum and Thomas occurred when Landrum hit
Thomas with a telephone as Thomas was about to
have intercourse with her against her will.[24] Lan-
drum's testimony regarding the events that imme-
diately preceded this incident, and her state of
mind when she struck Thomas with the telephone,
was somewhat inconsistent. On direct examina-
tion, Landrum testified that she was frightened
and that Thomas had threatened her with death

[22] Now, a person who begins an assault upon another with a
dangerous or deadly weapon cannot claim the right of self-
defense unless she has withdrawn from the fight in good faith
and clearly informed the other person of her desire for peace
and an end to the fight.

[23] With respect to the question of communicated withdrawal, Lan-
drum gave the following testimony on direct examination:

A. The handle of the telephone was laying down by the tub
and I picked it up and I hit him again in the head and he just
kept getting up and I just hit him again. I kept saying, "If you
would just leave me alone and let me go home, I will be just
fine," and he just kept getting up and I kept hitting him and
finally I guess he got tired, I don't know, but he just laid down
like and said he was going to sleep.

To the extent this testimony indicates that Landrum "clearly
informed [Thomas] of her desire for peace and an end to the fight" (n
22), this communicated withdrawal would not have affected the jury's
evaluation of the vast majority of the blows administered by Landrum
which occurred before the above described incident in the bathtub.

[24] On direct examination, Landrum gave the following account:

A. He got into bed and he went to climb up on top of me and
I reached for the phone and hit him in the head.

and serious injury.[25] On cross-examination, how-
ever, she testified that when she hit him with the
telephone she was not afraid that Thomas would
kill.[26] Landrum testified further that she hit

[25] *A.* He told me, he says, "Bitch, if you don't take your clothes
off we will fight, but we are going to fuck or fight either way
you want to do."
*Q.* How did you feel at that point?
*A.* Scared, and I took my clothes off.

\* \* \*

*A.* I just laid there and then he took his clothes off after I got
into bed and laid down, after I laid all the way down, and then
he took his clothes off.
*Q.* Was there any conversation during the time that he was
taking off his clothes?
*A.* No. He was just telling me that we were going to have sex
and that if we didn't, we would fight, and then he said that he
would hurt me if I didn't, you know, fight and he said he would
hurt me and then he said that because I had told him I wasn't
just going to let him just hurt me and that, I didn't see why he
was doing it that way because he understood the agreement,
and then he stated that he would kill me one way or the other
and that I would have sex and he would kill me and it would
be either one way or the other.

[26] *Q.* And you were afraid that he was going to kill you, is that
right?
*A.* At first I was not, no.
*Q.* When did you become afraid he was going to kill you?
*A.* When he just kept coming, yes.
*Q.* When he kept coming?
*A.* When he kept fighting.
*Q.* When you first hit him with the telephone, you weren't
afraid he was going to kill you?
*A.* At that point, no, because . . .
*Q.* When he pushed you and told you to take your clothes off
in the bedroom, you weren't afraid he was going to kill you?
*A.* No. I was not then afraid, no.
*Q.* So you weren't afraid he was going to kill you when you
took your clothes off?
*A.* No, I wasn't.
*Q.* You weren't afraid he was going to kill you when you got
to bed?
*A.* No.
*Q.* And you weren't afraid he was going to kill you when you
hit him with the phone, is that right?
*A.* No.

Thomas with the telephone to prevent him from having sex with her without paying first.[27]

In closing argument, the prosecutor argued that when Landrum hit Thomas with the telephone, she was not acting on the basis of a belief that she was in danger of death or serious bodily harm. More specifically, the prosecutor argued that Lan-

*Q.* So you weren't in fear for your life at that time, is that right?

*A.* At that particular point, no.

*Q.* So you didn't have any fear for your life when you hit him with that phone, is that right?

*A.* No, I didn't.

[27] *Q.* Why did you hit him in the face with the phone? You weren't afraid for your life and you weren't afraid he was going to kill you, so why did you hit him?

*A.* Because I wasn't going to give him no sex because he hadn't paid me.

*Q.* So you hit him because he wasn't going to pay?

*A.* Right . . . .

On redirect examination, Landrum testified:

*Q.* Celest, in answer to one of Mr. Ray's questions, did you have any intention of letting this man rape you?

*A.* No, sir.

On recross-examination, Landrum testified:

*Q.* You were going to sell him some sex, right?

*A.* Selling and raping is two different things.

*Q.* Is that an answer of yes or no, ma'am?

*A.* Yes. I was going to sell him some sex.

*Q.* Up until the time you hit him with the phone, this is when he says, "Take your clothes off and get into bed" and had he produced the money and paid you for the sex would you have went [sic] ahead and provided him with the sex, ma'am?

*A.* Yes, I would have.

*Q.* When did you decide he was going to try and rape you?

*A.* When he actually got his clothes off and got into the bed, yes.

*Q.* Your definition of rape was that he hadn't paid you so therefore he is going to rape you?

*A.* If he carries out the initial act, yes, or if he tries to.

drum's desire to prevent Thomas from having sex with her without first paying was not a sufficient justification for striking Thomas with the telephone.[28] The prosecutor also argued that Landrum was the initial aggressor and that there was no evidence of communicated withdrawal.[29]

In his closing argument, Landrum's lawyer argued that "rape" was a form of serious bodily harm and that Landrum hit Thomas to prevent being "raped." In rebuttal, the prosecutor again argued that Landrum hit Thomas with the telephone to prevent him from having sex without paying—not to prevent serious bodily harm or "rape."[30]

---

[28] What did she say on cross-examination? "He told me to take my clothes off. Were you in fear for your life? No, told me to get into bed. Were you in fear for your life? No, told me he wasn't going to pay me. Were you in fear for your life? No. When you hit him with the phone, were you in fear for your life? No." For self-defense, at the time of the act the Defendant must honestly believe that she is in danger of being killed or receiving serious bodily harm. The Defendant said she was not. The degree of danger must be serious bodily harm or death. The Defendant said she did not have that fear and said she was not afraid. In fact, the Defendant said, "Up until the point at which I hit him with the phone, had he produced the money, we would have continued with the sexual intercourse that the money was supposed to have been paid for." That is what she said on cross-examination. She was not afraid.

[29] See n 22 and the accompanying text.

[30] [S]he says, "I wasn't afraid." Did she ever say, "He tried to rape me?" She never said that. She says, "I thought he wasn't going to pay and told me he wasn't going to pay." She never says, "I was afraid he was going to rape me. I was afraid he was going to hurt me."

\*  \*  \*

[The judge] will say that the degree of danger must be serious bodily harm or death. The Defendant said no, not afraid that he was going to kill her. The Defendant said, "Had he come up with the thirty bucks after he ordered me into bed, after he ordered me into bed, after he told me to take my clothes off and before I hit him with the phone, had he come up with the thirty bucks, I would have still had sexual intercourse with him, yes. No, I was not afraid." She was not afraid, ladies and

The trial court instructed the jury on a "subjective" theory of self-defense. The jury was instructed that the requirements of self-defense would be satisfied, and that Landrum would not be guilty of any crime, if (1) at the time of the altercation with the decedent Landrum had an honest belief that she was in danger of death or serious bodily harm, and (2) Landrum used only that amount of force that appeared to her to be immediately necessary to repel the attack.[31] The instructions did not expressly mention "rape," but instead referred generally to "death or serious bodily harm."

B

This case illustrates the difference between one approach and another on the threshold question whether a woman may use force—deadly force *if necessary*—to prevent a sexual assault. Landrum testified on cross-examination that when she struck Thomas with the telephone she was not afraid that Thomas would kill her,[32] and that she hit Thomas to prevent him from having inter-

gentlemen. She is not concerned she is going to be raped. She is concerned that she is not going to get paid. This is up until the point that she hit him with the phone that she was not afraid.

[31] The trial court's instructions were based on CJI 7:9:01 and 7:9:02. The essential passages were as follows:

First, at the time of the act, the Defendant must have honestly believed she is in danger of being killed or of receiving serious bodily harm. If she so believes, she may immediately act and defend herself even to the extent of taking human life if necessary.

* * *

Third, you must be satisfied that the act or acts taken by the Defendant must have appeared to the Defendant at the time to be immediately necessary.

[32] See n 26.

course with her without paying first.[33] There was thus evidence from which the jury could have found that Landrum hit Thomas with the telephone to prevent nonconsensual intercourse—not to prevent other serious bodily harm.[34] By limiting the availability of self-defense to the situation where the defendant acted on the basis of an honest belief that she was in danger of death or "serious bodily harm,"[35] the court may have conveyed to the jury the impression that Landrum was not entitled to use deadly force in self-defense if the only reason she did not want to have sex with Thomas at the time she hit him with the telephone was that Thomas had not yet paid the $30.

This is not a case where the Court can rely on the assumption, perhaps reasonable in many situations, that the jury without further instruction would conclude that "rape" is a form of "serious bodily harm."

The prosecutor and Landrum's lawyer disagreed on the definition of "rape" and whether Landrum struck Thomas to prevent being "raped." The prosecutor argued that there was a difference between "rape" and nonconsensual intercourse when the reason for nonconsent was the other person's failure to pay initially, and that Landrum's conduct was based on the failure to pay.[36] Landrum's law-

---

[33] See n 27.

[34] This was the prosecutor's argument. See n 28.

[35] See n 31.

[36] You would think that if this is what happened, that he tried to rape her or he tried to kill her, she would kind of mention that in passing to Mr. Bonds, the first person she saw after this. You would think that. She didn't do that, not until the next day when she has had time to think about it that she bothers to say something about and she didn't say, "He tried to rape me." She said, "He tried to have sex without paying me."  &

* * *

yer argued that Landrum hit Thomas with the telephone to prevent being "raped," and Landrum testified that sex without initial payment was "rape."[37] The instructions did not assist the jury respecting the definitional question. Nor did the instructions provide guidance in resolving the disagreement, reflected in counsel's arguments, respecting Landrum's right to use force, however one categorizes the nonconsensual intercourse with which she was confronted.

The court's failure to provide the jury with meaningful guidance in applying the law of self-defense to the facts of this case was especially prejudicial to Landrum's defense under the circumstance that she was a prostitute. The jury may have concluded that since Landrum was otherwise willing to have intercourse with Thomas, the prospect of having intercourse with him without initial payment, or with no payment at all, was a "slight or insignificant injury."[38] Professor Perkins stated:

> But to speak of sexual intercourse with a prostitute without her consent as an "outrage to her person and feelings" is in the nature of mockery. Her unlawful career has not placed her beyond the protection of the law, it is true; but when her only grievance is that she was taken without being paid, the law of assault and battery would seem more appropriate than to include such an act within the scope of one of the gravest felonies . . . . [Perkins, Criminal Law (2d ed), ch 2, § 5, part C, p 158.]

---

Rita White says, "No, [she] didn't tell me he tried to rape her." They both said, "She told me that he said he wasn't going to pay." That is not rape. That is failure to pay. That is not rape, ladies and gentlemen of the jury. She said she was not in fear. [See also n 30.]

[37] See n 27.
[38] See CJI 7:9:01.

A trial in which the prosecutor's theory and argument reflected the sentiments expressed by Professor Perkins, and in which the court's instructions failed to prevent or even to discourage a verdict based on such sentiments, is not a fair trial.

### III

Common-law involuntary manslaughter has been defined as the unintentional killing of a person without malice, occurring in (1) the commission of an unlawful act not amounting to a felony and not naturally tending to cause death or serious bodily harm, (2) the commission of a lawful act negligently performed, or (3) the negligent omission to perform a legal duty.[39] The lead opinion would hold that the evidence in this case did not justify a conviction of involuntary manslaughter, and thus the trial court did not err in failing, sua sponte, to give an instruction on involuntary manslaughter even though it gave an instruction, sua sponte, on voluntary manslaughter.

### A

The lead opinion says that the evidence did not justify a conviction of involuntary manslaughter under the second part of the definition:

> As we stated in *Heflin, supra,* "the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." Thus, an act committed in self-defense which conforms to

---

[39] See *People v Beach,* 429 Mich 450, 477; 418 NW2d 861 (1988), *People v Townes,* 391 Mich 578, 590-591; 218 NW2d 136 (1974), and *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923).

this definition constitutes a lawful act. However, an act committed in self-defense but with excessive force or in which defendant was the initial aggressor does not meet the elements of lawful self-defense. Therefore, by definition, "imperfect self-defense" is an unlawful act that does not fall within the definition of common-law involuntary manslaughter: *a lawful act* negligently performed.[40]

By defining "act" with reference to the ultimate result of Landrum's conduct (i.e., Thomas' death), the opinion obviates the need for substantive analysis because Landrum does not contend that a homicide, if committed under circumstances that do not satisfy the requirements for self-defense, is not a crime.

The opinion's mode of analysis—equating the "act" with the killing—would effectively eliminate this form of involuntary manslaughter. For a killing—which, under the opinion's approach, is the predicate—to be a lawful act, the killing must be neither manslaughter nor murder. Under the opinion's approach, the only act that can serve as the basis for a conviction of involuntary manslaughter is an act which, "by definition," cannot constitute manslaughter.

The result is that a person who commits a homicide—where there is evidence justifying a finding that the killing was unintentional and there is no evidence regarding voluntary manslaughter or the other two forms of common-law involuntary manslaughter—is guilty of murder or is not guilty of any crime. This is contrary to the function of involuntary manslaughter which is to attach criminal liability to some unintentional killings.

---

[40] *Ante,* pp 508-509 (emphasis in original).

Analogous is *People v Jackson,* 390 Mich 621; 212 NW2d 918 (1973). Jackson shot and killed Wilson during a shootout with Holmes. A witness testified that Holmes fired first and that Jackson then returned fire. The Court observed:

> The unintended killing of an innocent bystander is not murder if justifiably committed in proper self-defense. It may, however, be manslaughter.
>
> "If A in proper self-defense aims at his adversary B but misses B and unintentionally strikes innocent bystander C, he is not liable for C's injury or death unless his conduct, under all of the circumstances (including the need to defend himself) was reckless with regard to C. In such a case he would be liable for battery if he merely injures, involuntary manslaughter if he kills, C." LaFave & Scott, Criminal Law, p 396. [*Id.,* p 624.]

Since A, who recklessly—yet unintentionally—kills C in an attempt to defend himself from B, may be guilty of involuntary manslaughter, then A may be guilty of that offense if he recklessly—yet unintentionally—kills B in attempting to defend himself from B. In both cases, A unintentionally kills a person while using force in self-defense. In *Jackson* —and the same should also be true here—the "act," which must have been "lawful" for purposes of gross negligence analysis, was defined with reference to what the defendant intended to do, not what he did.

The lead opinion distinguishes *Jackson,* saying that the Court's decision "would be analogous to the instant case if the defendant [in *Jackson*] intentionally killed his adversary, but not in proper self-defense."[41] The basis on which the opinion seeks to distinguish *Jackson* reflects the signers' view of the evidence and the credibility of

[41] *Ante,* p 509, n 21.

Landrum who testified that she did not intend to kill Thomas.

There was evidence from which the jury could have found that Landrum did not intend to kill Thomas.[42] There also was evidence from which the jury could have found that Landrum administered blows to Thomas in a lawful attempt to protect herself from imminent "death or serious bodily harm." We agree with Justice ARCHER's conclusion in dissent that there was evidence from which the jury could have found that in performing the lawful act of defending herself against imminent "death or serious bodily harm," Landrum used more force than was necessary and acted in a grossly[43] negligent manner.

B

More fundamentally, the analysis in the lead opinion is flawed in its emphasis on whether Landrum's "acts"—however defined—were lawful or unlawful. The opinion says that the evidence did not justify a conviction of involuntary manslaugh-

[42] The following exchanges took place during Landrum's direct examination:

*Q.* Celest, at any time did you intend to kill Mr. Thomas?
*A.* No, I didn't.
*Q.* Will you tell the Court and jury what your actions were at all times that you were in this fracas or in this fight?
*A.* To keep him from hurting me so I could leave to get my clothes on and leave and keep him from hurting me.

* * *

*Q.* At any time did you intend to kill Mr. Thomas?
*A.* No, sir. I didn't.

[43] The negligence required to establish involuntary manslaughter is different in kind from ordinary negligence. Such negligence is variously referred to as "criminal negligence" or "gross negligence" . . . . [*Townes,* n 39 *supra,* p 590, n 4.]

ter under the second part of the definition[44] because when Landrum killed Thomas she was not performing a lawful act.[45] Proceeding from the assumption that Landrum was engaged in an unlawful act when she killed Thomas, the opinion says that the evidence did not justify a conviction of involuntary manslaughter under the first part of the definition because Landrum's actions "either constituted a felonious act (assault with a dangerous weapon) or an act naturally tending to cause great bodily harm (assault with intent to do great bodily harm)."[46]

The distinction between a lawful act and an unlawful act as the analytical predicate for defining the elements of involuntary manslaughter may once have been maintainable. It is, however, a distinction that is no longer tenable.

1

The distinction between a lawful and unlawful act was first noted by Bracton.[47] In a discussion of misadventure (accident), Bracton observed that a person would be held liable for an unintentional killing that occurred during the performance of an unlawful act, but would not be held liable where the unintentional killing occurred during the performance of a lawful act at least when the person had exercised due diligence.[48]

When Bracton wrote, there was only one form of criminal homicide. By Coke's time, however, criminal homicide had been divided into murder and

[44] See the text accompanying n 39.

[45] See *ante,* pp 508-509 (quoted in the text accompanying n 40).

[46] *Ante,* p 508, n 19 (parentheticals in original).

[47] The historical discussion which follows is based on Moreland, Law of Homicide, ch 11, pp 183-195.

[48] 2 Bracton, On the Laws and Customs of England (Thorne trans, 1968), p 341. See also Moreland, n 47 *supra,* pp 183-184.

manslaughter.[49] According to Coke, an unintentional killing that occurred during the commission of an unlawful act—even the most trivial misdemeanor—was murder.[50]

The misdemeanor-manslaughter rule emerged in response to the harshness of the rule stated by Coke.[51] Hale reported that an unintentional killing that occurred during the commission of a felony was murder, but that an unintentional killing that occurred during the commission of any other unlawful act was not more than manslaughter.[52]

According to Hale, the misdemeanor-manslaughter rule did not apply to an unintentional killing that occurred during the commission of a misdemeanor *"malum prohibitum."* [53] In such a case, an unintentional killing was neither manslaughter not murder.[54] Foster later coined the term *"malum in se"* to describe those offenses to which the misdemeanor-manslaughter rule would apply.[55]

---

[49] See Moreland, n 47 *supra,* p 184.

[50] See Moreland, n 47 *supra,* pp 184-185.

[51] See Moreland, n 47 *supra,* p 186.

[52] See Moreland, n 47 *supra,* p 186. See, generally, 1 Hale, The History of the Pleas of the Crown, ch 39, pp 471-477.

[53] By *"malum prohibitum,"* Hale meant an act which was not inherently dangerous. See Moreland, n 47 *supra,* p 187. Hale gave the example of a violation of a statute which prohibited a person who did not possess land with a yearly value of one hundred pounds from keeping or using a gun. See Hale, n 52 *supra,* p 475 (quoted in n 54, *infra*).

[54]   Suppose therefore such a person not qualified shoots with a gun at a bird, or at crows, and by mischance it kills a bystander by the breaking of the gun, or some other accident, that in another case would have amounted only to chance-medley, this will be no more than chance-medley in him, for though the statute prohibit him to keep or use a gun, yet the same was but *malum prohibitum,* and that only under a penalty, and will not inhanse the effect beyond its nature. [Hale, n 52 *supra,* pp 475-476. See also Moreland, n 47 *supra,* p 186.]

[55] By *"malum in se,"* Foster meant an act which was inherently dangerous. See Moreland, n 47 *supra,* pp 186-187.

The misdemeanor-manslaughter rule was thus developed to ameliorate a rule of law that the intention to commit any unlawful act presumptively supplied the mens rea for murder. Where an unintentional killing occurred during the commission of a felony, the prior presumption—that the intention to commit the underlying criminal act supplied the mens rea for murder—was retained; this, of course, was the felony-murder rule.

Where an unintentional killing occurred during the commission of a misdemeanor, a new presumption—that the intention to commit the underlying criminal act supplied the mens rea for involuntary manslaughter—was adopted. The operation of this presumption was limited to situations where the unintentional killing occurred during the commission of a misdemeanor that was inherently dangerous. Where an unintentional killing occurred during the commission of a misdemeanor that was not inherently dangerous, there was no presumption of mens rea.

2

In *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980), this Court abolished the common-law rule that the mens rea for murder was supplied by the intention to commit the underlying felony.[56] The holding in *Aaron* necessarily implies that a killing

---

[56] Our review of Michigan case law persuades us that we should abolish the rule which defines malice as the intent to commit the underlying felony. . . .

Although the circumstances surrounding the commission of the felony may evidence a greater intent beyond the intent to commit the felony, or a wanton and willful act in disregard of the possible consequence of death or serious injury, the intent to commit the felony, of itself, does not connote a "man-endangering-state-of-mind." Hence, we do not believe that it constitutes a sufficient *mens rea* to establish the crime of murder. [*Id.,* pp 727-728. Emphasis in original.]

which occurred during the commission of a felony could—consistent with the evidence—be involuntary manslaughter or an innocent homicide. As the Court noted,

> The facts and circumstances involved in the perpetration of a felony may evidence an intent to kill, an intent to cause great bodily harm, or a wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm; however, *the conclusion must be left to the jury to infer from all the evidence. Otherwise, "juries might be required to find the fact of malice where they were satisfied from the whole evidence it did not exist."* [*Id.,* pp 728-729 (quoting *Maher v People,* 10 Mich 212, 218 [1862]). Emphasis added.]

The reason for holding involuntary manslaughter not applicable where the killing occurred during the commission of a felony—that the killing was presumptively murder—no longer has validity in light of *Aaron.* When a request to instruct on involuntary manslaughter as a lesser offense of murder is denied because the killing occurred during the commission of a felony, the presumption that was abolished in *Aaron* is allowed to resurface. If the jury finds that a defendant committed a criminal homicide, but that he did not act with the intention to kill, the jury is forced to choose between acquitting the defendant altogether or convicting him of a crime he did not commit. The possibility that the jury might convict of murder although not satisfied that the defendant acted with malice is the precise problem that this Court identified in *Aaron* and sought to remedy when it abolished the common-law felony-murder rule.

The second limitation on unlawful-act involun-

tary manslaughter—that involuntary manslaughter does not apply where the unintentional killing occurred during the commission of an unlawful act that naturally tends to cause death or great bodily harm—had independent force only when the killing occurred during the commission of a misdemeanor.[57] Thus, where an unintentional killing occurred during the course of an "inherently dangerous" misdemeanor, the defendant was guilty of murder, not manslaughter.[58]

The definition as stated in the lead opinion, and in the decisions on which the opinion relies, thus includes a "misdemeanor-*murder*" rule, and provides involuntary manslaughter liability for unintentional killings that occur during the commission of misdemeanors that do *not* naturally tend to cause death or great bodily harm. In both respects, the "Michigan rule" appears to be more extreme than its historical counterpart in England.[59] It is also more extreme than the "better view" as reported by the commentators.[60]

In apparent harmony with the "better view," the Michigan Criminal Jury Instructions provide that to convict a defendant of *unlawful-act involuntary manslaughter,* the jury must find that the killing occurred during the commission of "an unlawful act which was inherently and naturally

[57] Under the felony-murder rule, an unintentional killing was murder if it occurred during the commission of a felony.

[58] The exclusion of such killings from the scope of involuntary manslaughter was presumably not intended to immunize those killings from all criminal liability.

[59] As developed in England, the rule was that an unintentional killing during the commission of a misdemeanor "*malum in se*" was involuntary manslaughter and an unintentional killing during the commission of a misdemeanor "*malum prohibitum*" was not a criminal homicide. See ns 51-55, and the accompanying text.

[60] See LaFave & Scott, *supra,* p 594, 2 Torcia, Wharton's Criminal Law (14th ed), § 167, pp 266-269, and Perkins, *supra,* § 1, part C(B), p 73.

dangerous to human life."[61] The proof that is re-
quired to convict a person of unlawful-act involun-
tary manslaughter according to the standard jury
instruction is the same proof which relieves the
trial court of the obligation to instruct on unlaw-
ful-act involuntary manslaughter according to the
view expressed in the lead opinion. Something is
amiss.

Limiting the scope of unlawful-act manslaughter
so that an unintentional killing is presumptively
murder if in the judgment of the court it occurred
during the course of an unlawful act that has a
natural tendency to cause death or great bodily
harm no longer has validity in light of *Aaron*.[62] A
request to instruct on involuntary manslaughter
cannot be denied—consistent with *Aaron*—solely
on the basis that the killing occurred during the
commission of an unlawful act that in the judg-
ment of the court has a natural tendency to cause
death or great bodily harm.

In determining whether the evidence would jus-
tify a conviction of involuntary manslaughter, the
relevant inquiry is whether the defendant's con-
duct was grossly negligent with respect to the
safety of other persons.[63] Resolution of the ques-

---

[61] CJI 16:4:03. See also CJI 16:4:04 (involuntary manslaughter as a
lesser included offense of murder).

[62] Two of the cases consolidated for appeal in *Aaron* involved
killings that occurred during the commission of armed robberies; the
third case involved arson.

Armed robbery and arson may be thought by some to have a
natural tendency to cause death or great bodily harm. The *Aaron*
Court held, however, that the intention to commit these crimes did
not establish the mens rea for murder, and recognized that killings
which occur during the commission of these acts *could* constitute
involuntary manslaughter.

[63] The standard jury instructions recognize the importance of gross
negligence to unlawful-act involuntary manslaughter. See CJI 16:4:03
("the defendant must have been committing an unlawful act which
was inherently and naturally dangerous to human life, *that is, an act
which was grossly negligent of human life*") (emphasis added). See

tions: 1) whether the homicide was committed during the course of a lawful or unlawful act, 2) if the homicide was committed during the course of an unlawful act, whether the act was a felony or misdemeanor, and 3) if the unlawful act was a misdemeanor, whether the offense naturally tended to cause death or great bodily harm, does not further the inquiry into whether the defendant's conduct was grossly negligent.

The abolition of unlawful-act manslaughter—with the resulting application of a gross negligence standard—would not result in a significant increase in the number of verdicts that the homicide was not criminal. Many acts are unlawful precisely because they create a significant risk of injury to other persons. When a defendant commits a homicide during the course of one of those acts, the result will be the same whether the decision is based on the unlawfulness of the act or its inherently dangerous nature.

With respect to the situations where unlawful-act manslaughter might lead to a different result than gross-negligence manslaughter, Professors LaFave and Scott observed:

> There is no logical reason for inflicting manslaughter punishment on one who unintentionally kills another simply because he is committing a traffic violation, unless it makes sense to punish the one-in-a-thousand traffic violation, which by bad luck produces an unexpected death, far more severely than the nine hundred and ninety-nine violations which happily do not produce any such devastating result. [LaFave & Scott, *supra,* p 602.]

The unlawful-act manslaughter doctrine should be abolished because in most cases it is unneces-

also CJI 16:4:04 (involuntary manslaughter as a lesser included offense of murder).

sary—gross negligence will be sufficient where liability for involuntary manslaughter is warranted—and in a few cases it will lead to unjustifiable results. The rule has been abolished in England[64] and in at least some American jurisdictions,[65] rejected by the Model Penal Code,[66] and criticized by commentators.[67] The misdemeanor-manslaughter rule should be abandoned because there was no good reason for adopting it and there is no good reason for keeping it.

Notwithstanding one's views on the rule's merits, the misdemeanor-manslaughter rule should be abolished because it is inconsistent with this Court's precedents. In *Aaron,* the Court held that the intention to commit a felony (there, arson and armed robbery) does not establish as a matter of

[64] See Perkins, *supra,* § 1, part D, p 79, n 86.

[65] See LaFave & Scott, *supra,* p 602 ("Involuntary manslaughter, therefore, ought, on principle, to be limited to the situation of unintended homicide by criminal negligence. Today's trend, barely beginning, is properly in this direction"), and Torcia, n 60 *supra,* p 269 ("The misdemeanor-manslaughter rule has been abandoned in England, the Model Penal Code, and in a growing number of states. Manslaughter is now committed in such jurisdictions, whether the act be lawful or unlawful, only if the death is caused 'recklessly' ").

[66] American Law Institute, Model Penal Code & Commentaries, § 210.3, p 51 ("Section 210.3 departs from prevailing norms in abandoning the conception that a homicide should be *ipso facto* manslaughter if it resulted from an otherwise unlawful act. The misdemeanor-manslaughter analogue of the felony-murder rule is thus rejected"). The reasons for rejecting the misdemeanor-manslaughter rule are summarized:

However explained and confined, the misdemeanor-manslaughter rule is objectionable on the same ground as the felony-murder rule. It dispenses with proof of culpability and imposes liability for a serious crime without reference to the actor's state of mind. This result is not only morally unjustified, but it also operates quite inequitably among individuals. . . . [T]he Model Code rejects any form of strict liability in the law of homicide. [*Id.,* p 77.]

[67] See Moreland, n 47 *supra,* pp 188-195, LaFave & Scott, *supra,* pp 601-602, Perkins, *supra,* § 1, part C(B), pp 78-79.

law the mens rea for murder. A holding that a defendant is not entitled to an instruction on involuntary manslaughter because he was committing a felony or other unlawful, "inherently dangerous" act amounts to a holding that such unintentional killings—if criminal—are presumed as a matter of law to be murder. That is inconsistent with *Aaron*.[68]

3

In the instant case, the lead opinion says that Landrum's conduct in resisting Thomas "constituted a felonious act (assault with a dangerous weapon)," and as a result the evidence did not justify a conviction of unlawful-act involuntary manslaughter.[69] Before *Aaron,* the intention to commit a felony presumptively established the mens rea for murder. It is consistent with pre-*Aaron* law to hold involuntary manslaughter not applicable on the basis that Landrum killed Thomas during the commission of a felonious assault. After *Aaron,* however, such a holding is inconsistent with *Aaron*.[70]

The lead opinion also says that Landrum's conduct in resisting Thomas constituted "an act naturally tending to cause great bodily harm (assault with intent to do great bodily harm)," and that as a result the evidence would not justify a conviction

---

[68] See n 62.

[69] *Ante,* p 508, n 19.

[70] Even when a homicide is committed with a deadly weapon, malice is a permissible inference, not a mandatory presumption. *People v Martin,* 392 Mich 553, 561; 221 NW2d 336 (1974) ("The law does not imply malice where a deadly weapon is used. Michigan has long ago considered malice a permissible inference to be drawn by the jury rather than a presumption of law"). See also *People v Jacobson,* 400 Mich 859; 282 NW2d 922 (1977), rev'g *People v Jacobson,* 72 Mich App 489; 250 NW2d 105 (1976).

of unlawful-act involuntary manslaughter.[71] It is, again, inconsistent with *Aaron* to hold that involuntary manslaughter is not applicable on that basis.

Further, the opinion's assertion that Landrum's conduct constituted assault with intent to do great bodily harm is based on the signers' view of the evidence and the credibility of Landrum. In addition to testifying that she did not intend to kill Thomas,[72] Landrum testified that she did not intend to inflict serious bodily harm.[73] It is one thing for the Court to assume that a defendant intended to cause death or serious bodily harm where the record does not contain any direct evidence regarding the defendant's mental state and intent is thus a question of circumstantial inference.[74] It is another—and even more inappropriate—for the Court to disregard a defendant's direct testimony regarding her mental state. Questions of credibility are for the jury. This Court cannot properly find as a fact that Landrum was lying when she testified that she did not intend to cause serious bodily harm.

There was evidence from which the jury could have inferred that Landrum did not act with the mens rea for murder. She testified that she did not intend to kill or seriously injure Thomas. It is not "obvious" that she intended to create a significant

---

[71] *Ante,* p 508, n 19.

[72] See n 42.

[73]  *Q.* Did you attempt at any time to get that knife?

  *A.* No.

  *Q.* And why?

  *A.* Because I had no intention to do no bodily harm with nobody with a knife.

The jury could have inferred from this testimony that Landrum did not intend to cause serious bodily harm with instruments other than a knife.

[74] See *People v Heflin, ante,* p 539.

risk of death or serious injury and proceeded in a course of conduct despite that risk. She testified that her only intention was to avoid being "raped." The jury could have inferred that Landrum did not intend to kill Thomas, but that she failed to exercise care in repelling his sexual assault and that it was apparent to the ordinary mind that a failure to exercise such care was likely to result in serious bodily injury or death.

IV

The lead opinion calls attention to, and purports to resolve, the conflict in Michigan decisions on the question whether a defendant who asserts self-defense must have entertained an honest, as distinguished from an honest *and reasonable,* belief that he was in imminent danger of death or serious bodily harm. The opinion says that an honest and reasonable belief is required.[75]

In *Doss* the Court *said* that an honest and reasonable belief is required.[76] The Court did not there *hold,* however, that an honest and reasonable belief is required. Resolution of the question whether the justification of self-defense requires an honest, or honest and reasonable, belief does not appear to have been necessary to decision in *Doss,* which concerned the propriety of a bindover. Judicial opinions often contain statements that are not necessary to decision, and ordinarily those statements are regarded as just that: unnecessary statements. Apparently, that is how the authors of the Michigan Criminal Jury Instructions interpreted the Court's statement in *Doss.*[77]

---

[75] See *ante,* p 502.

[76] See *ante,* p 503, n 16.

[77] The first edition of the standard jury instructions was published in 1977, two years before *Doss* was decided. CJI 7:9:01 required an honest, not honest and reasonable, belief.

The question whether to adopt a "subjective," "objective," or mixed standard for determining when a person has the right to use force—deadly force *if necessary*—is an issue of jurisprudential significance. If an "objective" standard were adopted, additional questions would be raised, e.g., how is "reasonableness" to be determined, what is the effect of a defendant's "reasonable" or "unreasonable" mistake of fact. Application of an "objective" standard to a defendant's beliefs—with respect to the presence of a threat of imminent death or serious bodily harm, or the necessity of the force used to repel the perceived threat—has significant implications for the doctrine of "imperfect self-defense,"[78] an issue on which the Court expressly determined not to grant leave to appeal[79] and another "issue" which the lead opinion nonetheless discusses.[80]

There is no reason at this juncture to address the question whether an honest, or honest and reasonable, belief should be required. Resolution of the question is not necessary to decision in the instant cases. The parties have not asked the Court to decide the question, nor is the question mentioned in the Court's limited grant order in *Landrum.* The Court's failure to definitively an-

---

The second edition of the standard jury instructions was published in 1989. Although the Commentary contains a discussion of the statement in *Doss,* CJI2d 7.15 continues to require only an honest belief.

[78] We agree that if a "subjective" standard is applied, the "unreasonableness" of a defendant's belief does not mitigate to involuntary manslaughter a homicide that is otherwise murder. Cf. *ante,* p 503, n 16.

[79] In granting leave to appeal this Court said:

The Court has determined not to entertain argument regarding the doctrine of imperfect self-defense. [*People v Landrum,* 431 Mich 906 (1988).]

[80] See *ante,* pp 507-509.

swer the question does not appear to be causing any difficulties in practice. The prosecutor in *Heflin* did not object to the trial court's instructions, and the prosecutor in *Landrum* objected to the self-defense instructions on the basis that Landrum did not fear death or serious bodily harm, not on the basis that a "reasonable" belief should also have been required.

Given the complexities involved, it is not prudent to resolve this question in a case in which it is entirely unnecessary to do so. It is difficult to imagine a more inopportune moment to adopt a rule whereby the jury is allowed—and required—to evaluate the "reasonableness" of a person's beliefs regarding the need to use force in self-defense. The determinations whether a woman's fear of sexual assault is "reasonable," and whether her belief that a particular form of nonconsensual sexual activity is "serious bodily harm" is "reasonable," seems fraught with difficulty. In all events, the question should not be resolved without a discussion of the merits of the competing positions.

CAVANAGH, J., concurred with LEVIN, J.